315 So.2d 131

**Joe Nathan JACKSON, alias**

**v.**

**STATE.**

**7 Div. 341.**

Court of Criminal Appeals of Alabama.

May 6, 1975.

Rehearing Denied May 27, 1975.

Myron K. Allenstein, Gadsden, for appellant.

William J. Baxley, Atty. Gen., and Jack A. Blumenfeld, Asst. Atty. Gen., for the State.

BOWEN W. SIMMONS, Supernumerary Circuit Judge.

Appellant-defendant, an indigent here with appointed counsel, but not at *nisi prius*, was convicted of robbery and given forty years imprisonment.

The victim of the alleged robbery was Mrs. Velma Henry who testified that she was robbed of a handbag which she valued at about $8.00. She was carrying the handbag by her hand. The handbag contained $3,200.00 in cash, of which $2,800.00 was in $100.00 bills, two $50.00 bills and the rest in $20.00 bills and $1.00 bills. The bag also contained prescription medicines she valued at approximately $20.00. The robber also took her Whitmier wristwatch which she valued at $150.00. The money came to her by an inheritance in Pennsylvania.

The robbery occurred on the night of July 8, 1974, somewhere between 9:30 P.M. and 10:00 P.M. at the Baptist Memorial Hospital in Gadsden where she had gone to sit with her sick mother who was a patient in the hospital suffering from a massive stroke. She had sat with her mother every night since June 8, 1974.

The witness testified that she parked in the parking lot right close to spaces reserved for pastors along the lower level of the lot right at the foot of the hill. She got out, locked the car door and started walking up the sidewalk to go up to the hill leading to the front entrance of the hospital.

The witness further testified that as she was about half way up the hill, "somebody come up behind me and struck me across this shoulder right here. (Witness indicating) Knocked me off the sidewalk onto the ground." The witness then described her injuries and testified to her losses cataloged with values, supra. She testified

that she never saw who struck her and would not be able to identify her assailant.

Mrs. Henry testified on cross examination that she had a brother, James Curry, who was a Highway Patrolman.

The next witness for the State was Mrs. Jean Richards. She testified that on the night of July 8, 1974, she had occasion at lunch time to go to the Baptist Hospital where she remained until evening, a "little after ten, somewhere in the neighborhood." She testified that as she came out the front door and started down towards the ministers' parking area, she met a lady she had never seen before. The "lady", Mrs. Henry, was going up and the witness was coming down from the hospital. The witness testified:

". . . Then I got just a little ways down the sidewalk from the hospital. There was a car that made a turn . . . . A colored guy got out of the car, slammed the door and disappeared . . . . Then, I didn't do anything but stop still with my gun in my hand.

. . . . . .

"As he got out of the car he dropped behind the first car at the minister's parking area . . . .

. . . . . .

"He [the colored man] run up the sidewalk . . . jumped off the sidewalk. Then, lunged her, I would say lunged ---"

The woman had just passed Mrs. Richards on the sidewalk and before the man got the pocketbook, "she was drug in the street." The witness stated she could not recognize or identify the assailant.

Roy McDowell, an investigator for the Sheriff's Office, testified for the State. He was a State Investigator for the Public Safety Department for a number of years until his retirement.

This witness testified that on the night of July 8, 1974, at approximately 9:30 P. M., he had occasion to go to the Baptist Memorial Hospital in Gadsden; that he pulled in the hospital parking lot right at the first alley. As he pulled in, he observed "a car sitting longways; it wasn't in a parking place, it was sitting longways on the south end of the parking lot there, just sitting there." He testified that it was the only car there that was not parked in a regular parking space; the only one he saw; that it was a blue Pontiac with "some males in the car."

The witness further testified:

"A. Well, I pulled on up in the parking lot and parked in the lane there in the parking area, and I got out, was walking across the parking lot. This car came on, easing on by me there.

"Q. That is the car you had seen not in the parking space?

"A. Yes, sir. And they were looking at me, the one on the right hand side was. He turned all the way around looking at me, walking, I was walking across the lot going into the hospital.

"Q. Did you get a good look at him?

"A. Yes, sir.

"Q. Then, what happened?

"A. Well, it went on out there and turned back down in the hospital lot in the first lane, and I went on in the hospital.

. . . . . .

"Q. All right, and when you came back out what did yout see?

"A. Right below the door of the hospital as you start down the sidewalk there was some people standing there, and there was some blood on the pavement. And I asked what—some of them what happened. And they told me they had robbed a woman there.

"Q. All right, sir. And what did you do then?

"A. I went on down to the car and radioed the jail to get a registration on a tag number.

"Q. All right, what tag number was that?

"A. 31–1294.

. . . . . .

"Q. All right. So, at the time you saw the car in the parking lot you made a note of the tag number. Was it a written note or a mental note?

"A. No, I remembered it.

. . . . . .

"Q. All right, sir. Now, I will ask you if you later saw this individual in the car that you have described to us.

"A. Yes, sir.

"Q. Where did you see him?

"A. City Hall.

"Q. All right, sir. I will ask you if that person is in Court today.

. . . . . .

THE COURT: Where was it in City Hall that you saw him?

"A. I saw him up in the jail; in the lobby of the jail. The car was downstairs at the jail.

. . . . . .

"Q. Can you identify the man that you saw that night—

"A. Yes, sir.

"Q. —out there in the parking lot?

"A. Yes, sir.

"Q. And can you identify him independently of seeing him later?

"A. I saw him later that night.

"Q. Yes, sir. All right, sir, and who is that man?

. . . . . .

"Q. And can you point out that individual to us?

"A. Yes, sir. (Indicating)

"Q. Is that this Defendant here?

"A. Yes, sir.

"Q. Joe Nathan Jackson.

"A. Yes, sir.

"Q. All right, your witness."

The witness testified that he stayed in the hospital thirty or forty minutes. Soon after he gave the tag number of the car to radio operator, Ace Williams, a private investigator, called and said he was following the car.

Donald Hoskins, a Gadsden Police Officer, testified about spotting the car about twenty or twenty-five minutes after he was alerted by radio and given the tag number; then giving chase with siren sounding. The pursued car turned off the hard surfaced road onto a dirt road and was pursued in a cloud of dust and overtaken in a private driveway not shown to be that of the car's occupants.

There were two men inside the pursued car. One was the defendant and the other was Arthur Lee Hunter. The officers arrested Hunter for reckless driving and the defendant for disorderly conduct. Both were taken to jail and the car was towed by a wrecker to the jail premises and impounded.

After the car was taken to the City Hall, an inventory was made of the car's contents. No search warrant was obtained. This was routine procedure. This witness was in charge of the inventory.

As to what they found when the inventory was taken, the witness testified as follows:

"A. . . . I found thirteen $100 bills, a 20 and a 5 and two ones. Total of $1,327. And stuff found in the front seat between—about mid way of the front seat was either two or three hun-

dred, I don't remember exactly, the exact amount. And in the back seat of the car there was some other stuff."

The "other stuff" mentioned was some articles of clothing.

Arthur Lee Hunter declined to testify when informed of his rights not to do so.

Thereupon both sides rested, and the court overruled defendant's motion to exclude the State's evidence.

Defendant here disclaims right of officers to search his automobile at the police station. He contends that probable cause for making his arrest for robbery did not exist and, therefore, the search of his car at the police station was illegal and violated his constitutional rights for that he was illegally arrested.

It appears from the evidence that the arresting officers were alerted through radio communication that a robbery had been committed at the Baptist Hospital and to stop an automobile bearing a certain tag number, 31–1294; the automobile being a blue Pontiac.

When this number was spotted on a moving automobile, the officers followed the car and sounded their siren. The moving car, instead of stopping in obedience to the siren, took off at a reckless speed and was finally overtaken in a private driveway intersecting a dirt road.

■ It does not appear that the officers arrested the occupants of the fleeing and speeding car, in which defendant and his companion were riding, for robbery. Hunter was arrested for reckless driving, and the defendant for disorderly conduct, both offenses being misdemeanors and committed in the presence of the officers. Both arrests were lawful. Title 15, § 154, Recompiled Code, 1958.

We do not necessarily need to consider the existence *vel non* of probable cause with respect to arresting defendant for the robbery. It is true that the officers were informed of the robbery, the license tag

number of an automobile bearing suspected robbers, and the efforts of the officers to stop the car and perhaps to question the suspects in the manner authorized by law. The siren sounding off did not give the occupants a right to flee in a reckless manner in violation of law. Neither did it authorize the defendant to behave in a manner toward the officers that invoked an arrest for disorderly conduct. The arrests were for the misdemeanors and not for the commission of the robbery. It is true the efforts of the officers to pursue an investigation of the robbery by stopping the car bearing defendant and his companion led up to the arrest for the misdemeanors, but did not justify or excuse the reckless driving and the disorderly conduct.

■ No effort was made to search the automobile at the time the occupants were arrested. This came when the car was impounded at the police station.

Under the circumstances, we do not think the officers were required to hunt up a magistrate in the middle of the night to obtain a search warrant to search the car; neither were they required to place a guard over the car to protect it against looting. They pursued a reasonable approach, that is, they made a reasonable inventorial search. In so doing, they found this batch of currency that corresponded in denominations to the money which was stolen from Mrs. Henry.

The presence of this money in the automobile and the fear of its discovery probably prompted the occupants to flee at a reckless speed when the police siren was sounded—an inference may be drawn of a guilty conscience; also of the defendant's disorderly conduct after the car was stopped.

The officers had impounded the car, and it was their duty to protect the contents of the car against theft or else be blamed for negligently causing the arrestees a loss of valuables. It turned out that an unusual quantity of money was hidden under the floor mat.

 While it appears from the evidence that the arrests were for the commission of misdemeanors in the presence of the officers, we think the officers had sufficient, probable or reasonable cause to arrest the defendant for the commission of a felony, namely, robbery. Such an arrest when there is probable or reasonable cause may be effected without a warrant. Title 15, § 154, Code, supra. *Berry v. State,* 27 Ala. App. 507, 175 So. 407.

It appears from the evidence in this case that when the officers stopped the car in their quest for the robbers who robbed Mrs. Henry and were in a car bearing license tag number 31–1294, that a crowd about seven persons, all blacks, came out of the house "and there was lots that came up, I'd say about fifty to seventy-five came up standing around." Several officers were present.

 We think that it could be argued here that the officers, in removing the car to the police station and getting it away from the assembled crowd, acted with good judgment in delaying the search for the stolen money. An exhibition of that much money before the crowd could have invited trouble. There was no compelling necessity, in view of the crowd of unknown persons and their character or propensities, to make a search incident to arrest.

We think that the search at the station, without a search warrant, was lawful and not in violation of defendant's rights. Applicable thereto are the pronouncements in *Chambers v. Maroney,* 399 U.S. 42, 90 S. Ct. 1975, 26 L.Ed.2d 419 (1970).

We are, therefore, unwilling to hold under the circumstances that the search was illegal and the evidence as to the fruits thereof was inadmissible.

 We hold that defendant's motion to suppress the evidence was correctly denied; also the affirmative charge was correctly refused. The issue of guilt of the defendant was for the jury to decide. It is true the evidence was circumstantial, but this was still a question for the jury. Charge 1 tendered by defendant, "Testimony tending to prove identity is to be scrutinized with extreme care," is abstract and not based on the evidence. *Duchac v. State,* 52 Ala.App. 327, 292 So.2d 135(8). The charge is also faulty in that it fails to say who is to do the scrutinizing.

We have given the excellent brief filed by defendant careful study. We have also reviewed the entire record. We find no ruling of the court that erred to the prejudice of appellant.

The judgment is affirmed.

The foregoing opinion, was prepared by the Honorable BOWEN W. SIMMONS, Supernumerary Circuit Judge, serving as a judge of this Court under § 2 of Act No. 288, July 7, 1945, as amended; his opinion is hereby adopted as that of the Court.

Affirmed.

All the Judges concur.