TYSON, Judge.
Jimmy Claude Goodman, Jr., was charged by indictment with the unlawful possession of Amphetamine and Amobarbital in a two-count indictment, contrary to the provisions of Act No. 1407, Section 401(a), Acts of Alabama, 1971 Regular Session. The jury found the appellant guilty under both counts, and the trial court set punishment at eight years imprisonment.
Prior to trial a suppression hearing was conducted at which time Montgomery Detectives J. E. Nichols and William Fuller each testified with reference to the arrest and detention of Jimmy Claude Goodman, Jr., on the night of July 2, 1976.
According to Detective Nichols, he was assigned to the Bureau of Narcotics and Dangerous Drugs of the Montgomery Police Department as part of a special investigative team. At about 9:00 o’clock on the night of July 2, 1976, he, Captain Lynch, Captain Arnett, and Detective Fuller, were in the office having a discussion concerning *693 a drugstore robbery at Southside Drugs on Court Street in Montgomery which had occurred the previous evening. The officers had received a telephone call concerning a station wagon which had been observed near the scene of the drugstore robbery the previous evening and which was then observed in the South Lawn area of Montgomery.
Detectives Nichols and Fuller left in an unmarked green Chevrolet Malibu, driving toward the intersection of U. S. 31 South and U. S. 80 West, and saw an off-white or beige station wagon with a luggage rack on top (R. p. 5). The officers gave chase and turned on the blue lights on top of their vehicle. Officer Nichols stepped from the police vehicle to the station wagon, identified himself, and asked the driver, Jimmy Claude Goodman, Jr., to step out of the station wagon. Officer Nichols related that a lookout had been placed for a white male with a ruddy complexion and reddish tinted hair, driving a station wagon, and that Goodman answered the description in question. As Goodman alighted from the vehicle, Officer Nichols noticed a tan prescription bottle lying on the floorboard on the driver’s side. He reached down and retrieved it (R. p. 6).
Nichols stated he opened the bottle and observed some green and clear capsules, and also some brown and clear capsules with small spangles inside and the capital letters “S K F” on the outside of each type capsule. Nichols stated that he recognized the capsules as being Amphetamines because of his prior work in the drug field.
The appellant was patted down at the scene of the stop, and Officer Nichols removed a .22 caliber projectile and a pharmaceutical vial that contained an injectable drug from appellant’s pants pocket. The drugs retrieved by Officer Nichols were turned over by him to State Toxicologist Alan Adair (R. p. 8).
Officer Nichols drove the appellant’s vehicle to Police Headquarters and secured it. The following morning the vehicle was searched pursuant to a search warrant obtained by Detective Fuller and Officer Segrest.
On cross-examination, Officer Nichols related that he had received a call on his police radio from Officers Arnett and Lynch concerning the station wagon which fit the description of the wanted vehicle and was asked his assistance in stopping it. This was within twenty-four hours of the robbery the evening before at the drugstore.
Montgomery Police Detective William Fuller related that on the evening of July 2, 1976, he was a partner of Officer Jim Nichols. He stated that about 9:00 or 9:30 o’clock in the evening they received a call by police radio to stop a station wagon which was light beige in color, had a luggage rack on top, and a type of sticker on the rear bumper. The vehicle was reportedly involved in the robbery of the drugstore on South Court Street in Montgomery the evening before. Detective Fuller stated that he and Detective Nichols gave chase on Highway 31 South just as the vehicle turned West on Highway 80 toward Dan-nelly Field. The station wagon was stopped, Officer Nichols stepped to the side of the vehicle, and asked the driver to step out. He stated this was the appellant, Jimmy Claude Goodman, Jr. Detective Fuller stated that he saw a tan prescription bottle after Detective Nichols found it on the floorboard of appellant’s car (R. pp. 19-20). The following morning Detective Fuller went before Judge Matthis Piel and obtained a search warrant in which he described the prescription bottle and the drugs contained therein as the basis for obtaining a search warrant for the station wagon which was secured at Police Headquarters.
Pursuant to this warrant, Detective Fuller and Corporal William Segrest searched the station wagon and removed from it a brown paper bag underneath the front seat. They placed the contents thereof in a bag which was sealed, then delivered by Montgomery Officer Campbell to the State Toxicologist Office.
Moreover, prior to obtaining the search warrant, the appellant had executed a written consent authorizing a search of his 1968 *694 Ford station wagon, 4-11529, located at Police Headquarters (R. p. 35).
After hearing the three officers’ testimony, the trial court overruled the appellant’s motion to suppress.
Alabama State Toxicologist Alan Adair testified that on July 7, 1976, he received from Montgomery Police Detective J. E. Nichols a plastic bag with Officer Nichol’s initials on it, and that he marked it and gave the officer a receipt for it. He stated that he assigned Case No. 13215-A to the bag. He subsequently removed the contents and analyzed this. He noted that in one bag was a tan plastic prescription bottle which contained four green and clear capsules having the designation S K F D92 at each end, and also one green and clear capsule having S K F D91 at each end. Additionally, there were fifty-two brown and clear capsules having the designation S K F E13 at each end and fifteen brown and clear capsules having the designation S K F E14 at each end (R. p. 42).
Mr. Adair then analyzed these drugs and testified that he had custody of these until the day of trial, and, based upon his examination, the five green and clear capsules contained Amphetamine and Amobarbital (R. p. 43) and the sixty-seven brown and clear capsules were both types of Amphetamines. He stated that each of these are controlled substances within the meaning of Alabama law and require the prescription of a registered practitioner. Mr. Adair’s laboratory report was offered into evidence, but upon objection of defense counsel the trial court declined to admit this (R. p. 46).
Mr. Adair then testified that based upon his experience and examination these drugs were normally prescribed for weight loss by a physician and were capable of being taken either orally or crushed and injected into a person’s veins.
Mr. Adair was also allowed to testify that he received on July 2, 1976, a brown bag from Montgomery Police Officer Jimmy Gamble and that he had exclusive custody of the items received until the date of trial. In Mr. Adair’s testimony he identified one-half dozen different types of controlled substances which were analyzed and examined as coming from the bag received from Officer Gamble and marked with Montgomery Detective W. C. Segrest’s initials.
Montgomery Police Detective James E. Nichols was then recalled and related receiving information concerning a robbery on the night of July 1, 1976, of Southside Drugs on South Court Street. He stated that Detective Fuller was in the vehicle with him when they received this information that an off-white or beige station wagon with a luggage rack on top and an unusual sticker on the bumper with three white males and one white female occupant, the driver having a ruddy complexion and red tinted hair, the female being a blond or wearing a blond wig, had been involved in the robbery of a drugstore and that several types of drugs had been taken. He then described their giving chase on the following night, July 2, 1976, and stopping the vehicle just as it turned on U. S. 80 from U. S. 31 South. He stated that Detective Fuller was accompanying him that night also.
Officer Nichols related that, after having the appellant alight and patting him down, he then drove the station wagon to Police Headquarters where it was secured, and Detective Fuller transported the appellant. He also related that the items which he seized from the appellant were secured and kept under his care and control until he delivered them personally to State Toxicologist Alan Adair. He stated that he showed the bottle which he found in the vehicle to Detective Fuller and he also showed him the capsules inside the bottle.
Detective Fuller was then recalled to the stand and corroborated Detective Nichol’s testimony concerning the information received about the station wagon and the stopping and arrest of the appellant in Montgomery County. Detective Fuller testified that he transported the appellant to Police Headquarters on the night of July 2, 1976, and that he had observed the bottle at the scene of the arrest. Detective Fuller further related that he, accompanied by Corporal Segrest and Corporal Sticker, went before the Recorders Court Judge, *695 Matthis Piel, and obtained a search warrant, and the following morning searched the station wagon at Police Headquarters. Corporal Segrest acted as the evidence officer in the case.
Corporal Segrest was then recalled to the stand and testified as to his participation on the morning of July 2,1976, in the search of a Ford station wagon at Police Headquarters. He stated that he was present when a consent to search form was executed by the appellant, Jimmy Claude Goodman, Jr. Segrest related that Goodman was fully advised of his Miranda rights and of the legal consequences of giving authorization to search. Segrest stated that nevertheless the two officers went before Judge Piel and obtained a search warrant “just to be safe” before going into the vehicle. He stated that a brown paper bag was found underneath the driver’s side which contained one-half dozen different drugs, some Demerol, some Leritine, and others contained Codeine and Amphetamines, was sealed and delivered by the officers on July 7, 1976, to Mr. Allen Adair, State Toxicologist.
The appellant’s • motion to exclude the State’s evidence was then overruled.
The State then called Montgomery Police Detective Cecil Humphrey who testified that on the night of July 1, 1976, he was involved in the investigation of the robbery of Southside Drugs on South Court Street in Montgomery, Alabama. Officer Humphrey stated he was present at Police Headquarters on the morning of July 3, 1976, when Montgomery Police Corporal Jimmy Lisenby read to the appellant his “Miranda rights,” and that without any threat, coercion, intimidation, or inducement being offered the appellant, Jimmy Claude Goodman, Jr., gave a typewritten statement which was taken down in his presence. After determining that this statement was purely voluntary, the trial court then admitted the appellant’s statement, which is as follows (R. pp. 104-106):
“A. Question — Jimmy Lisenby was asking the questions.
“The first question was, are you aware of the fact that the above store was — let me start again.
“This is the statement of Claude Jimmy Goodman, white male, age 43, as given to Corporal J. H. Lisenby and Detective C. H. Humphrey in Room 209 of the Montgomery Police, 3 July, 1976 at 11:55 a. m. in regard to his knowledge of the robbery of the Southside Drug Company on 1 July, 1976 at approximately 9:00 p. m. It starts off with the question: Are you aware of the fact that the above store was robbed 1 July, 1976? Answer: I was aware of it after it happened. Question: How do you know about it? Answer: Because I was out in the car when they, came running back with two boxes in their hands. Question: Who are you talking about? Answer: O’Neal Goodman and Raymond Lowe. Question: Who are they? Answer: O’Neal is my brother and the other one is his friend. Question: Did you drive them to the drugstore? Answer: Yes. I drove them all over town. Question: Did you know they were going to rob the store? Answer: No. Question: Didn’t they tell you to wait for them while they robbed it? Answer: No. They didn’t tell me they were going to rob anything. Question: Who else was with you? Answer: Nell Brazzell. Question: What did they say to you when you pulled up in the shopping center and they got out of the car? Answer: Buddy told me that they would be back in a minute. Question: Is Buddy the same as O’Neal? Answer: Yes. Question: Did you see any weapons when they got out of the car? Answer: No. Question: How long were they gone? Answer: Four or five minutes. Question: Were they carrying anything when they got out of the car? Answer: Not that I noticed. Question: Were they carrying anything when they got back in the car? Answer: Yes. Question: Who was carrying what? Answer: I don’t know which one was carrying which gun, but both of them had one and both of them was carrying narcotics. Question: Was either one carrying anything besides the guns and drugs? Answer: One of them had a box of candy, but I don’t *696 know which one. Question: What did either one of them say when they got in the car? Answer: One of them said, get out of here. Question: Where did you go from there? Answer: To Gary and Peggy Cole’s house on Shades Valley. Question: Were they at home when you got there? Answer: Peggy was. Question: What did Peggy have to say about the guns and drugs? Answer: She asked them if the guns were loaded, and Raymond told her they were. And then they went over and unloaded them. Her and Nell went in the back room and I guess Nell told her what we had done. Question: When did Peggy and Gary Cole learn O’Neal and Raymond were escaped from prison? Answer: Yesterday. Question: Did you see Gary or Peggy use any of the drugs? Answer: Peggy took a Dexamil Spansule. Question: Do you know where the guns came from? Answer: No.
“It is signed by Jimmy Lisenby and signed by me and signed by Claude Goodman.”
The State then called Mr. Rex R. Riggins, who related that he was the pharmacist in charge of Southside Drugs at 4516 South Court Street in Montgomery in July, 1976. He stated that on the night of July 1, 1976, shortly after 9:00 p. m., the store was robbed by a man who first came in and asked for help, then pulled a sawed-off shotgun and pointed it at him. He stated that the man asked for all of “Class A Narcotics” which have now been reclassified under different schedules. Mr. Riggins stated that he handed to the party at gunpoint all of his injectable narcotics, including some Morphine and Demoral tablets. The man asked for some disposable syringes, and he gave the robber two disposable syringes. Mr. Riggins related that the robber directed that he lie face down on the floor. Prom an examination of certain drugs, Mr. Riggins stated that he could not positively state that the drugs shown to him were the drugs taken from him on July 1, 1976, but that drugs of this type were taken at that time.
The appellant presented no testimony or other evidence at trial.
I
Appellant contends that the stopping of his station wagon by Officers Nichols and Fuller on the night of July 2, 1976, was without probable cause, and the obtaining of the prescription vial was a violation of his Fourth Amendment rights against an unreasonable search and seizure.
Most recently, Judge DeCarlo, speaking for this Court in Herrin v. State, Ala.Cr.App., 349 So.2d 103, 106, cert. denied Ala., 349 So.2d 110, observed:
“The United States Supreme Court, in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, recognized the ‘investigative stop concept.’ The court in Terry v. Ohio, acknowledged that the government’s interest in effective crime prevention and detection justified the recognition that: “ ‘ . . . a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.’
“The Court stated this was a legitimate investigative function.
“In Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612, the court said that:
“ ‘ . . . The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response ... A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in the light of the facts known to the officer at the time.’ [Citations omitted]
“In Alabama the investigative stop concept was adopted in the following legisla *697 tion, T. 15, §§ 118(1) and 118(2), Code of Alabama 1940, Recompiled 1958, 1973 Cum.Supp. to Yol. Five, which read:
“ ‘§ 118(1). Authority to stop and question. — A sheriff, or other officer acting as sheriff, or his deputy, or any constable, acting within their respective counties, or any marshal, deputy marshal, or policeman of any incorporated city or town, within the limits of the county or any highway patrolman or state trooper may stop any person abroad in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or other public offense, and may demand of him his name, address and an explanation of his actions.
“ ‘§ 118(2). Authority to search for weapons. — When a sheriff, or other officer acting as sheriff, or his deputy, or any constable, acting within their respective counties, or any marshal, deputy marshal, or policeman of any incorporated city or town, within the limits of the county, or any highway patrolman or state trooper has stopped a person for questioning pursuant to this chapter and reasonably suspects that he is in danger of life or limbs, he may search such person for a dangerous weapon. If such officer finds such a weapon or any other thing the possession of which may constitute a crime, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person.’ ”
Applying the above principles to the facts of the case at bar, we are clear to the conclusion that the two officers had the necessary probable cause to stop the appellant, Jimmy Claude Goodman, Jr., and to direct him to alight from the vehicle and be patted down. This was proper police procedure. Herrin, supra; Dunaway v. State, 50 Ala.App. 200, 278 So.2d 200, cert. denied 291 Ala. 93, 278 So.2d 205.
Further, based upon the information received over the police radio, the officer properly looked inside, and the prescription vial being in plain view, it was properly seized as an item of evidence. Rutherford v. State, 48 Ala.App. 289, 264 So.2d 210; Youngblood v. State, 47 Ala.App. 571, 258 So.2d 913.
Clearly, the pat down of the appellant was proper. Hoppins v. State, Ala.Cr.App., 337 So.2d 134; Dunaway v. State, supra; Campbell v. State, Ala.Cr.App., 354 So.2d 325, 1977.
In an opinion rendered December 20, 1977, Campbell v. State, Ala.Cr.App., 354 So.2d 325, Judge Bowen, speaking for the Court, related:
“A law enforcement officer may have probable cause for a warrantless arrest based on the identification or description of the suspect or his motor vehicle without knowing the identity of the person to be arrested. Sexton v. State, Ala.Cr.App., 349 So.2d 126 (1977); also Oatsvall v. State, 57 Ala.App. 240, 327 So.2d 735, cert. denied, 295 Ala. 414, 327 So.2d 740 (1975); Jackson v. State, 55 Ala.App. 334, 315 So.2d 131, cert. denied, 294 Ala. 760, 315 So.2d 136, cert. denied, 423 U.S. 898, 96 S.Ct. 202, 46 L.Ed.2d 132 (1975). The arresting officer may base his arrest on an official description of the suspect or his motor vehicle as where he receives information from a police radio bulletin or report describing the person or vehicle. Brown v. State, 55 Ala.App. 615, at 619, 318 So.2d 311 (1975); McClendon v. State, Ala.Cr.App., 341 So.2d 174, writ, quashed, Ala., 341 So.2d 178 (1976). The identification or description of an offender or a motor vehicle may also be supplied to the police by the victim of or witness to an offense as well as by an informer. Turk v. State, 53 Ala.App. 106, 298 So.2d 37 (1974); Burrow v. State, 55 Ala.App. 24, 312 So.2d 596 (1975); Thomas v. State, 50 Ala.App. 227, 278 So.2d 230 (1973); Smith v. State, 51 Ala.App. 349, 285 So.2d 512, cert. denied, 291 Ala. 798, 285 So.2d 515 (1973).
“While mere presence is never a sufficient basis for a finding of probable cause to arrest, presence when coupled with other circumstances may ripen suspicion into a reasonable belief capable of supporting a finding of probable cause.”
*698 Under the foregoing authorities, the stopping of the appellant’s vehicle, the “pat down” of the appellant, and his arrest was a reasonable course of action in view of the radio dispatch and the circumstances confronting Detectives Nichols and Puller at the time.
II
The appellant contends that Officer Puller lacked probable cause to give the affidavit in support of the search warrant on the morning of July 3, 1976; hence the issuance of the warrant and the resulting search and seizure were improper.
As related above, Detective Puller was present at the time of the arrest and seizure of the prescription vial by Detective Nichols. He observed this at the scene. Moreover, Detective Fuller transported the appellant to Police Headquarters on the night of July 2, 1976, and assisted Officer Nichols in securing the appellant’s vehicle. Clearly, therefore, Detective Puller possessed the necessary information, and probable cause to swear out the warrant under which the search was made on the morning of July 3, 1976, at Police Headquarters. Funches v. State, 53 Ala.App. 330, 299 So.2d 771, cert. denied 293 Ala. 752, 299 So.2d 778, and authorities therein cited.
Moreover, the search warrant itself is not contained in this record; hence, its validity is not before us for review. Barbosa v. State, Ala.Cr.App., 331 So.2d 811; McHellen v. State, Ala.Cr.App., 351 So.2d 689.
III
We have carefully examined this record in light of appellant’s contention that the State did not show a proper chain of possession of the evidence presented at trial; hence, his motion to exclude should be granted.
The evidence related by the two arresting officers, Nichols and Puller, together with Officer Segrest’s testimony, clearly established a proper chain of the seizure of the items which were subsequently examined by State Toxicologist Adair. This contention is without merit.
Further, we see no error in the admission of the testimony with reference to the drugs which were seized on the preceding evening from the pharmacist, Mr. Rex Riggins. This was part of the identification of the drugs seized from the appellant’s vehicle. See Brantley v. State, 294 Ala. 344, 317 So.2d 345.
We have carefully examined this record and find no error therein. The judgment is therefore
AFFIRMED.
All the Judges concur.