[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 349 
Buying, receiving, and concealing stolen property; sentence: six years imprisonment.
Mrs. Mae Stembridge of Dothan, Alabama, who had temporarily vacated her home because of fire damage, returned to the home on February 3, 1976, and found that her dining room table and chairs, two marble top tables, one antique dresser, and a china closet had been stolen. The appellant and his girl friend were charged with the unlawful possession of those items by an indictment which, in pertinent part, was as follows:
 "William R. Waters, Jr., alias Billy Waters and Lethia Speigner, whose names are to the Grand Jury otherwise unknown, did, buy, receive, conceal or aid in concealing, one antique china cabinet, one antique Victorian dresser and antique furniture of the aggregate value of to-wit: $7000.00, the personal property of Mae Stembridge, knowing that they were stolen and not having the intent to restore them to the owner. . . ."
The stolen items listed in the indictment were recovered through a search of the appellant's apartment. Police officers were led to the apartment based upon information they obtained as a result of a search of a local warehouse. The search of the warehouse was based upon information furnished to officers by an undisclosed confidential informant. By way of a pretrial motion and hearing, objections during trial, and by motion for a new trial and a hearing thereon, the appellant challenged the admissibility of the fruits of the search. The ruling of the trial judge in each instance was adverse to the appellant.
The facts presented on the pretrial motion and during trial, upon which the search warrant was issued and the trial court based its decision, are completely different than the evidence adduced upon the motion for a new trial. We will summarize the facts as they ultimately appeared.
On October 19, 1976, Dothan Police Officer James Wachob received information from a confidential informant, known by Wachob for a year and a half, who told him that a rental warehouse in town contained furniture stolen by the appellant. The informant gave Wachob keys to the warehouse and to the appellant's apartment, but did not give him the name of the warehouse. Officers Wachob and Locke contacted Mrs. Gladys Jackson, manager of the Store-All Warehouse in Dothan, and asked if William Waters had rented a storage unit from her. She stated that he had not; however, the officers returned the next day and asked if a woman had rented space recently. Mrs. Jackson went through her files for the officers, and the name Lethia Speigner turned up. Mrs. Jackson told the officers that Lethia Speigner had rented the warehouse space some two months earlier, and at that time she observed Mrs. Speigner storing in the warehouse a white wicker baby carriage and other antique furniture.
After Mrs. Jackson had closed the warehouse office for the day, Wachob and Locke returned, without a search warrant, and opened the storage unit with the key furnished by the informant. They observed the contents of the storage unit and unwrapped a bundle containing several guns. They copied down the serial numbers of the guns and returned them to the same position in the warehouse where they were found. Among the items observed during the illegal entry was a wicker baby carriage.
The two officers returned to the police station and made inquiry through the Alabama Criminal Justice Information System (ACJIS) computer as to whether the guns in question had been stolen. No guns of *Page 350 
the same serial numbers were listed with the ACJIS as stolen.
The two officers then called the police departments in the cities of Montevallo, Eufaula, and Enterprise to determine if any of the items observed in the warehouse had been reported stolen in those cities. They were informed by police in Enterprise that a wicker baby carriage and other items had been stolen from the residence of Mrs. Margaret A. Rawls about a year earlier on October 30, 1975. Officer Wachob drove to Enterprise that night and obtained copies of various offense reports from the Enterprise Police Department. The wicker baby carriage was listed in one of those reports.
The next morning, October 21, 1976, Wachob went to the district attorney's office where an affidavit was prepared which he presented to the Dothan City Recorder (municipal judge). The officer gave no sworn testimony before the Recorder, and the search warrant was based solely upon the affidavit.
The affidavit was in pertinent part as follows:
 ". . . there is now being concealed in warehouse no. 232, Store-All Warehouse, 310 Bic Road, Dothan, Alabama, property which was stolen from the residence of Mrs. Margaret A. Rawls, 301 W. College, Enterprise, Alabama, on October 30, 1975, said stolen property being more particularly described as follows: Antique furniture, including one white wicker baby carriage. Affiant's probable cause for believing that the above-described items are concealed at the above-mentioned location is as follows: Affiant received information from a reliable informant within the past 48 hours to the effect that Billy Waters had stolen furniture and weapons stored in a local (Dothan) rental warehouse. Affiant checked a local Dothan warehouse and found that Lethia Speigner, known to affiant as a frequent companion of Billy Waters, had rented a warehouse there . . . said warehouse being no. 232. Affiant contacted the manager of the above described Store-All Warehouse, and found that:
 (1) Billy Waters had attempted to rent a warehouse there within the last 2 months but had been turned down; and (2) the day the manager rented the above-described no. 232 warehouse to Waters' known companion, Aletha (sic) Speigner, which was rented to Speigner after Waters had been refused rental of a warehouse, the manager of the above-described warehouse, Mrs. Jackson, observed Lethia Speigner unloading numerous antiques and storing them in the above-described warehouse no. 232, among them a white wicker baby carriage, distinct in appearance, and exactly matching the description of the white wicker baby carriage which had been stolen from the residence of Mrs. Margaret A. Rawls. . . ." (Emphasis supplied.)
Armed with a search warrant based upon the above affidavit, Wachob, Locke, and other officers returned to the warehouse and again opened the storage unit with the key furnished by the informant. During the search and inventory of the items, a food stamp identification card and a card table were found which bore the appellant's name. Officer Locke and an investigator then went to 92 Colony Square Apartments around 11:00 A.M. in order to locate the appellant or Lethia Speigner.
When the officers reached the apartment, they knocked and Lethia Speigner came to the door. The officers immediately placed her under arrest, and she stepped outside and closed the door behind her. Neither Investigator Hobbs nor Officer Locke went inside the apartment. When Lethia Speigner answered the officers' knock, Officer Locke was able to see through the cracked door momentarily. He observed a desk and what appeared to be a portion of a keyboard of a typewriter. He could not see the body of the typewriter but could determine that the keyboard was white. Locke was not close enough to ascertain the shape of the typewriter keys nor the trade name of the typewriter. However, he went to the Recorder's Court that afternoon and executed a search warrant affidavit which was in pertinent part as follows: *Page 351 
 ". . . Harold Locke . . . deposes and says that he has probable cause to believe and does believe that certain articles taken in the burglary of Whittaker and Warren Insurance Co., Enterprise, Alabama, which burglary occurred on August 20, 1976, are being concealed in the residence of Lethia Speigner and Billy Waters which is located at no. 92 Colony Square Apartments, Dothan, Alabama, said stolen articles being more particularly described as follows: an Olympia typewriter, serial # 141086, and a Casino hand calculator, black in color. Affiant's probable cause for believing that the above-described stolen articles are located at the above-described residence is as follows: (1) Based partly on information received from Mrs. Jackson, manager of Store-All Warehouse, Inc., 310 Bic Road, Dothan, Alabama, to the effect that she had rented Lethia Speigner warehouse no. 232 . . . approximately 2 1/2 months ago, and, shortly after, had observed Lethia Speigner moving various antiques into said warehouse # 232, including a white wicker baby carriage which exactly matched the description of a baby carriage which was taken in the burglary of Margaret A. Rawls . . . affiant obtained a search warrant this date (10/21/76) for Warehouse no. 232. . . . (2) Affiant executed said search warrant and found numerous items of stolen merchandise which had been taken in several recent burglaries in Dothan, Alabama and Enterprise, Alabama . . . including numerous personal effects of one Billy Waters, whom affiant knows to be a frequent companion of Lethia Speigner, and whom affiant knows to be residing with Lethia Speigner at the present time in a residence listed in Billy Waters' name, said residence being located at # 92 Colony Square Apartments, Dothan, Alabama. (3) Immediately upon finding this stolen merchandise, which did not include the Olympia typewriter . . . and the Casino hand calculator . . . affiant proceeded to Apt. # 92, Colony Square Apartments . . . for the purpose of arresting Lethia Speigner. . . . Lethia Speigner answered the affiant's knock at the door, opened it, and affiant immediately saw, behind her, within this apartment, lying on the table, a typewriter which, as near as affiant could tell, matched the description of the above-described typewriter taken in the aforementioned burglary. . . ." (Emphasis supplied.)
Both Officers Wachob and Locke concealed their illegal entry into the warehouse prior to obtaining the search warrant. In sworn testimony given during the suppression hearing, both officers testified that they had not opened the warehouse prior to obtaining the search warrant. During examination of Wachob, the following occurred:
 "Q. Sergeant Wachob, at any time before you went to the store or warehouse with a search warrant on October 21st, and opened the door with a key at that time, had you ever attempted to use that key on that door at any previous time?
"A. No, sir, I had not.
"Q. Had you ever tested to see if it work?
"A. No, sir, I had not.
 "Q. Had anyone else connected with the Dothan Police Department, to your knowledge?
 "A. No, sir. Not to my knowledge, no one from the police department had."
* * * * * *
 "Q. Did you ever try any other keys at the Stor-All Warehouse to see if they would open any of the doors there?
"A. No, sir.
 "Q. At any other time, before you went there with the search warrant?
"A. No. sir.
"Q. Anybody else, to your knowledge?
"A. No, sir, not to my knowledge."
During the examination of Officer Locke, the following occurred:
 "Q. Now, on that occasion — I'm talking about the afternoon of the 20th, when you were at the Stor-All Warehouse, did either of you or Sergeant Wachob have any keys? *Page 352 
"A. Sergeant Wachob had some keys.
 "Q. Did he test any of these keys to see if they would fit any of the locks at the warehouse?
"A. No, sir."
It was not until after the trial that defense attorneys discovered evidence which caused the police officers in question to recant and tell the truth. Attorneys for the appellant requested information from the ACJIS concerning the inquiry made by the Dothan police concerning stolen articles found in the warehouse. It was only then that the appellant's attorneys discovered that Officers Wachob and Locke had, on the night before obtaining the search warrant, furnished the ACJIS with the serial numbers of the guns stored in the warehouse. Thus, during the hearing on the motion for a new trial, the newly discovered evidence came to light. Officers Wachob and Locke then testified that they had entered the warehouse the night before obtaining the search warrants and had furnished the ACJIS with the serial numbers of the weapons found in the warehouse prior to the search. After receiving negative reports from the ACJIS computer, the two officers then placed telephone calls to police departments in cities where they knew the appellant had some connection.
Wachob testified that after they had looked into the warehouse on October 20, the calls were made to other police departments. He stated that he went to Enterprise that night after Locke had talked to someone with the Enterprise Police Department. He picked up offense reports and discussed the baby carriage with Lt. Rainey of the Enterprise Police Department. Wachob stated that, "the purpose that I went to Enterprise for was to get his report on the baby carriage." He testified that at the time he first looked inside the warehouse, the only information he had about the baby carriage was what Mrs. Jackson had told him.
Officer Locke testified that after the ACJIS inquiry resulted in a negative reply, he placed a call to Enterprise and talked to Lt. Rainey of that police department. He gave Rainey the serial numbers of the weapons and inquired about the white wicker baby carriage. Prior to observing the carriage during the warrantless search, the only information Officer Locke had concerning it was what Mrs. Jackson had told him, that being that she had seen Lethia Speigner storing a white baby carriage and some antique furniture in the warehouse about two months earlier. From the evidence adduced on the motion for new trial, it appears that neither Officer Locke nor Wachob knew that a white wicker baby carriage had been stolen until after they observed it during the warrantless search and later called the Enterprise Police Department. The trial court overruled appellant's motion for new trial.
 STANDING
The State, on appeal, challenges the appellant's standing to object to the search of the warehouse which in turn led to the search of the apartment. The State contends that, since the warehouse was not rented in the appellant's name, he has no standing to avail himself of the protection of the Fourth Amendment.
The State finds its primary support in the case of Aldermanv. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176
(1968). That case involved the use of evidence obtained through illegal electronic surveillance of a co-conspirator. The Supreme Court refused to expand the exclusionary rule, stating that a Fourth Amendment right may only be urged by those whose rights were violated by the search itself, and that co-conspirators and co-defendants have been accorded no special standing. However, in Alderman, it appears that the appellant's premises were not the subject of the surveillance and neither were his private conversations intercepted. There, a co-defendant's premises were under surveillance and conversations between two other parties implicated the appellant. The facts in the instant case are altogether different and, therefore, Alderman does not apply. *Page 353 
Fourth Amendment rights are personal in nature and may be asserted only by those whose own protection has been infringed by the search and seizure. At one time, a defendant asserting such a right had to establish that he was the owner or possessor of the seized property or that he had a possessory interest in the premises searched. However, the Supreme Court relaxed the standards for establishing standing in Jones v.United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697
(1960). The standards now applying are:
(1) When possession of the seized evidence is an essential element of the offense, the prosecution is precluded from denying that the defendant has the requisite possessory interest to challenge admissibility of the evidence; and
(2) A person legitimately on the premises when the search occurs may assert a Fourth Amendment right even though he has no possessory interest in the premises. Jones, supra; Simmonsv. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247
(1968).
In the instant case, the appellant is charged with a possessory crime. The State's affidavit to obtain the warrant to search the warehouse stated specifically that an informant provided information, "that Billy Waters had stolen furniture and weapons stored in a local (Dothan) rental warehouse." After the warehouse was searched, a second affidavit was executed for a warrant to search the appellant's apartment. That affidavit set out the circumstances of the warehouse search, stating that numerous items of stolen merchandise had been found therein, "including numerous personal effects of one Billy Waters."
After alleging in two search warrant affidavits that there was probable cause to believe Waters was concealing stolen property in a warehouse and in his apartment, the State now contends that he had no standing to challenge the searches. In effect, the State is charging him with possession and concealment of stolen property in the indictment, but maintaining in the suppression hearing that he did not possess the merchandise. This it cannot do. Jones v. United States;Simmons v. United States, supra. See also: United States v.Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1960); UnitedStates v. Harwood, 470 F.2d 322 (10th Cir. 1972).
 THE WAREHOUSE WARRANT
The protection of the Fourth Amendment extends to a commercial warehouse. See v. City of Seattle, 387 U.S. 541,87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). Also see: Adair v. State,53 Ala. App. 251, 98 So.2d 671 (1974). Since we determine that appellant has standing to challenge the searches, the next strand of this Gordian knot to unravel is that of the effect of the illegal warehouse search on subsequent actions taken by the police.
The officers were initially led to the warehouse through the tip of a confidential informant. Probable cause may be based solely upon hearsay information obtained from a reliable informant. Jones v. United States, supra; Aguilar v. Texas,378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Clenney v.State, 281 Ala. 9, 198 So.2d 293 (1966). The informant's tip may be the sole basis for probable cause provided it meets the two pronged test of Aguilar: the veracity prong and the basis of knowledge prong.
In the instant case, the affidavit fails to meet either prong of the Aguilar test. First, the affidavit merely recites that the affiant received information from, "a reliable informant." The magistrate is left with only the officer's conclusion that the informant is reliable. The law requires that the magistrate be given sufficient information to enable him to make a judicial determination of reliability of the informant rather than depending solely upon the officer's conclusion. The minimum information allowable for this purpose in an affidavit in Alabama is a statement that the information came from, "a person whose record of reliability for correctness has been good." Neugent v. State, Ala., *Page 354 340 So.2d 52 (1976); State ex rel. Attorney General, 286 Ala. 117, 237 So.2d 640 (1970). The conclusion that officers "received reliable information from a credible person" was condemned in Aguilar, supra. An affidavit that the FBI "`has been informed by a confidential reliable informant'" was condemned in Spinelli v. United States, 393 U.S. 410,89 S.Ct. 584, 21 L.Ed.2d 637 (1969).
Secondly, the instant affidavit fails to set out any of the underlying circumstances to show how the informant learned of the stolen items being stored where he says they were stored. Again, the magistrate is left only with the officer's mere conclusion that the informant's hearsay information was correct.
Judge Charles E. Moylan, Jr., of the Maryland Court of Special Appeals, sets forth with exceptional clarity the functions of a magistrate in evaluating hearsay information. In "Hearsay and Probable Cause: An Aguilar and Spinelli Primer," Mercer Law Review, Vol. 25, p. 741 (1974), Judge Moylan states:
 "Just as the magistrate must satisfy himself as to the credibility of a primary source by administering an oath to him and by looking at him, so too must he, by some alternative means, satisfy himself as to the credibility of the secondary source. In neither case may he accept someone else's conclusion in lieu of arriving at his own. Just as he may not permit an affiant's assertion as to his own credibility to serve as dispensation for the oath, neither may he permit the affiant's assertion as to his informant's credibility to serve as dispensation for the required recital of all necessary data about that informant that will permit the magistrate to draw his own conclusion as to credibility. This, simply, is the `credibility/reliability' or `veracity' prong of Aguilar.
 "Once the magistrate has decided that the informant is believable, he has still only half completed his ultimate determination. He must still decide what the information is worth. He has decided that the source is not lying, but he has not yet decided whether the source is mistaken. The magistrate's second function is now to evaluate the information which he is accepting as true and to see what probabilities emerge from that available data. Again, he may not accept the conclusion of either the affiant-observer or the nonswearing informant. He must take from either of those sources his facts and then arrive at his own conclusion as to the significance of those facts."
Thus, the instant affidavit fails to meet either prong of the tests set out in Aguilar and Spinelli, supra. However, if a tip fails one of those prongs, the informant's tip may still constitute the sole basis for a finding of probable cause if his information is in such detail and minute particularity that the "magistrate, when confronted with such detail, could reasonably infer that the informant had gained his information in a reliable way." Spinelli, supra. This is the self-verifying tip. Hatton v. State, Ala.Cr.App., 359 So.2d 822 [Ms. November 15, 1977]. In the instant case, we find the informant's tip completely lacking in detail.
Less detailed information from a reliable source may also establish probable cause where the key elements of the information are verified or corroborated. State ex rel.Attorney General, supra; Payton v. State, 47 Ala. App. 347,254 So.2d 351 (1971). Finally, a tip that will not meet any of these standards may still be used in conjunction with a number of other factors to support a finding of probable cause.Hatton, supra.
In United States v. Squella-Avendano, 447 F.2d 575 (5th Cir. 1971), at 580, it was stated:
 ". . . First, if the information provided is in such `detail' and `minute particularity' that `a magistrate, when confronted with such detail, could reasonably infer that the informant had gained his information in a reliable way,' then the report, if sufficiently incriminating, may, without more, be grounds for finding probable cause. Secondly, less detailed information from a reliable source may *Page 355 
be used as grounds for a finding of probable cause if independent investigation by law enforcement agencies yields sufficient verification or corroboration of the informant's report to make it `apparent that the informant had not been fabricating his report out of whole cloth.' Corroboration must render the report `of the sort which in common experience may be recognized as having been obtained in a reliable way.' Thirdly, even a report that is not under the above two standards sufficient of itself to establish probable cause may count in the magistrate's determination of probable cause, but only as one of a number of other factors of `further support' tending to show probable cause. Examples of satisfactory `further support' given in Spinelli involved law enforcement agencies' knowledge of independent facts which suggest criminal conduct or of facts which take on an aura of suspicion in light of the informant's tip." (Footnotes omitted.)
Here, although the affidavit does not satisfy the two pronged test set out above, it may have nevertheless appeared to the magistrate that the affiant had made an independent investigation based upon the informant's tip and had determined that a stolen baby carriage had been stored in the warehouse in question by the appellant's girl friend sometime within the prior two months. However, there is no showing in the affidavit that the officers had probable cause to believe that the baby carriage would still be stored in the warehouse on October 21. Evidence taken on the appellant's motion to suppress would not support the officers' belief that a wicker baby carriage was still stored in the warehouse at the time the affidavit was prepared. Additionally, the warehouse manager, Mrs. Jackson, gave conflicting testimony concerning the baby carriage. She first testified that she did not tell the investigating officers that she saw a baby carriage being stored in the warehouse on the date that Lethia Speigner rented the storage unit. On further examination, she said that she did disclose that fact to the officers; then during further testimony, she stated that she did not remember. But assuming arguendo that the affidavit on its face states sufficient facts to establish probable cause, we are still left with the ultimate fact, established on motion for a new trial, that much of the information contained in the affidavit, independent of the informant's tip, came about through leads obtained by way of the illegal search conducted on the night of October 20.
The State's contention is that the information contained in the affidavit was "obtained entirely from independent sources." The State contends that the "fruit of the poisonous tree" doctrine applies only to evidence that is obtained as a result of the prior illegality, citing Silverthorne Lumber Company v.United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed.2d 319
(1920). It contends in its brief that the information received from Mrs. Jackson and the informer was the "fruit of a healthy tree" and that the officers' prior information did not become unusable merely because they saw objects (the baby carriage) during the illegal search which they already knew about.
The fallacy in the State's position relative to the independent source doctrine is that the officers did not know that a baby carriage had been stolen at the time they committed the illegal entry into the warehouse on October 20. Both officers later testified that the only information they had at the time of the illegal search was what Mrs. Jackson had told them. Both stated that the only thing Mrs. Jackson told them was that she had observed Lethia Speigner storing a white baby carriage in the warehouse some two and one-half months earlier. At the time of their illegal entry, the officers did not know (1) whether the baby carriage was still in the warehouse, (2) whether that baby carriage was stolen property, or (3) whetherany baby carriage of a similar description had been reported stolen. It was only after they had burglarized the warehouse that they verified that the wicker baby carriage was still there. It was only after confirming that fact by illegal means that the officers then began to *Page 356 
call other cities making inquiry about a wicker baby carriage. It was only after calling three cities that the officers discovered that such a carriage had been stolen in Enterprise almost a year earlier. It was only then that they could state in the affidavit that there was a carriage in the warehouse "exactly matching the description of the white wicker baby carriage which had been stolen."
It is obvious that confirmation of the existence of the carriage, through the illegal search, is what led the officers forward in their inquiries to the other cities to determine if such a carriage had in fact been stolen. The record reveals that the illegal warehouse search provided the impetus for the officers' further investigation and so influenced all their future actions in this case that its taint is evident in everything the officers did or said thereafter.
The purpose of the exclusionary rule is "to deter — to compel respect for the constitutional guaranty in the only effectively available way — by removing the incentive to disregard it." Elkins v. United States, 364 U.S. 206,80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); Mapp v. Ohio, 367 U.S. 643,81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The exclusionary rule would thus deny the State the use of any evidence it obtained as a result of the illegal warehouse search. The next question presented then is whether the search of the appellant's apartment came as a result of the prior search of the warehouse.
 THE APARTMENT SEARCH
An examination of the affidavit supporting the warrant to search the apartment reveals the following:
(1) A typewriter and a hand calculator were alleged to have been stolen from Enterprise two months earlier;
(2) Based "partly" on information received from Mrs. Jackson, the warehouse had been searched;
(3) The warehouse search revealed numerous stolen items stored there, "including numerous personal effects of one Billy Waters;"
(4) The affiant knew Waters to be a frequent companion of Lethia Speigner, both residing at the appellant's apartment;
(5) Since the stolen merchandise at the warehouse did not include the typewriter and hand calculator, the affiant apparently concluded that those two items must be at the apartment;
(6) That when the affiant went to the apartment to arrest Lethia Speigner, he saw a typewriter which, "as near as affiant could tell," matched the description of the stolen typewriter in question.
Since Officer Locke swore to the affidavit, the magistrate had no reason to doubt the truth of the statements contained therein. Taken at face value, the affidavit would support the issuance of a warrant. Likewise, evidence presented during the hearing on the motion to suppress did not contradict the facts set out in the affidavit. On the motion to suppress, the trial judge therefore was not in error in finding that probable cause did exist for the issuance of the warrant to search the apartment. However, evidence taken during the hearing on the motion for a new trial was altogether different than that presented initially to the magistrate or to the trial judge on the motion to suppress.
Evidence on the motion for a new trial along with prior evidence in the case would support the following findings:
(1) Information obtained by the officers during the illegal search of the warehouse prompted their inquiry to the Enterprise Police Department. The Enterprise Police Department then furnished the Dothan officers with copies of offense reports from which affiant obtained the information concerning the baby carriage, the typewriter, and the hand calculator which appeared in his affidavit to obtain the warrant to search the apartment;
(2) Leading officers to the appellant's apartment was the discovery of "numerous personal effects" of the appellant during the warehouse search; *Page 357 
(3) The affiant deduced that the typewriter and hand calculator were probably at the appellant's apartment simply because they were not turned up in the search of the warehouse;
(4) Officer Locke only had a momentary glimpse through a crack in the door of the apartment and saw only what appeared to be a keyboard of a typewriter;
(5) The officer had no description of the stolen typewriter except its trade name and serial number;
(6) His observation of the keyboard inside the apartment was so poor that he could not ascertain whether the keys were round or square or the color of the typewriter body;
(7) That in fact the only typewriter found in the apartment was an antique black L.C. Smith typewriter rather than a gray Olympia typewriter, and furthermore the hand calculator was not found in the apartment either;
(8) Officer Locke's testimony established that his recitation in the affidavit comparing the typewriter he saw with the description of the stolen typewriter was completely invalid. The qualifying phrase, "as near as affiant could tell," added nothing to its credibility.
In McConnell v. State, 48 Ala. App. 523, 266 So.2d 328 (1972), this court reversed a conviction for buying, receiving, and concealing stolen property where another Dothan police officer had made false statements in an affidavit to obtain a search warrant. This court found the affidavit to be sufficient on its face, but held the search warrant to be invalid because material statements in the supporting affidavit were subsequently contradicted and proven erroneous by the testimony of the affiant himself. In McConnell, this court quoted fromWalker v. Graham, 228 Ala. 574, 154 So. 806 (1934), stating:
 "`. . . [N]o one will be permitted to wrongfully procure the issuance of a process by practicing a fraud or imposition upon the court or authority, and seek shelter behind such a process, though it be ever so regular upon its face . . .'"
 CONCLUSION
After a review of the evidence submitted on the motion for a new trial and considering the totality of the circumstances of the entire case, we can only come to the conclusion that the search of the apartment was the end result of an exploitation of information obtained by the illegal search of the warehouse. The chain of evidence leading from the illegal search of the warehouse to the search of the apartment is clear and unbroken. The evidence obtained as a result must be considered as "fruit of the poisonous tree" and, therefore, inadmissible. Wong Sunv. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441
(1963).
The one remaining issue concerns the trial court's overruling of the motion for a new trial. Generally, a motion for a new trial is addressed to the sound discretion of the trial judge. Such a motion may be granted upon a showing of newly discovered evidence which could not have been discovered with due diligence before trial. The newly discovered evidence must be such that it would probably change the results of the trial; must be material; not merely impeaching; not merely cumulative; and must not be addressed to minor discrepancies in testimony.Lackey v. State, 41 Ala. App. 46, 123 So.2d 186, cert. denied,271 Ala. 699, 123 So.2d 191 (1960).
In the instant case, evidence of the officers' illegal search of the warehouse had been concealed and was such that it could not have been reasonably discovered with due diligence by the defense before trial. The evidence presented on the motion for a new trial was such that, had it been known and presented during the hearing on the motion to suppress, it would have changed the results of the trial in that suppression of the evidence would have been mandated. The newly discovered evidence presented was certainly material, was not cumulative, and was not introduced for the purpose of merely impeaching testimony of other witnesses given during the course of the trial. *Page 358 
The appellant's motion for a new trial should therefore have been granted.
The appellant is presently under a five year sentence for burglary from Barbour County which this court affirmed inWaters v. State, Ala.Cr.App., 357 So.2d 368 [1978]. He is also under a five year sentence from Houston County on another charge of buying, receiving, and concealing stolen property which we have this date also affirmed. However, due to the reason set out herein, appellant is entitled to a new trial on the instant charge.
REVERSED AND REMANDED.
All the Judges concur except DeCARLO, J., concurs in result only.