423 So.2d 258 (1981)
Thomas R. PIANZIO
v.
STATE.
1 Div. 186.
Court of Criminal Appeals of Alabama.
February 24, 1981.
Rehearing Denied March 17, 1981.
Certiorari Quashed December 30, 1982.
*259 Albert C. Bowen, Jr. and James M. Fullan, Jr., of Beddow, Fullan & Vowell, Birmingham, for appellant.
Charles A. Graddick, Atty. Gen., and Jean Williams Brown, Asst. Atty. Gen., for appellee.
Alabama Supreme Court 80-438.
BOOKOUT, Judge.
Possession of a controlled substance; sentence: fifteen years' imprisonment.
Prior to appellant's trial, appellant filed motions to suppress the State's evidence and later filed amended motions to suppress. These motions referred to evidence seized pursuant to search warrants executed on February 10, 1980. A hearing to consider these motions was held on July 28, 1980. At the conclusion of the hearing, the trial court denied the motions. A review of the proceedings which transpired at the hearing convinces us that appellant's motions to suppress were due to be granted. Because of the trial court's denial of appellant's motions to suppress and the subsequent admission of the unlawfully obtained evidence at trial, we have no alternative but to reverse and remand this cause.
Central to appellant's motions to suppress and amended motions to suppress are allegations that the affidavits accompanying the search warrants contained false information and that the search warrants were improperly executed in the nighttime. For the sake of clarity, the affidavits and search warrants in question are set out fully below.
*260 
*261 
*262 Briefly, the facts which gave rise to Deputy Thomas Byrd's affidavits, upon which Judge Nesbit relied when she issued the requested search warrants, reveal the following:
Around 5:00 p.m. on February 10, 1980, Deputy Byrd of the Baldwin County Sheriff's Department first received a "be on the lookout" bulletin (commonly called a "BOLO") for an Aero Commander airplane, black, silver and yellow in color. Deputy Byrd received the "BOLO" from U.S. Customs officials in New Orleans while he was on duty at the Foley office. Later that evening, while at the police station in Gulf Shores, Deputy Byrd had a telephone conversation with a Customs official who informed him that the airplane had landed in Marianna, Florida, and that one of the occupants of the plane had been arrested, but that the pilot had taken off in the plane. The Customs official told Deputy Byrd that he "suspected" or "suspicioned" the airplane "might be carrying some type of contraband." That was the only information Byrd received from Customs.
Deputy Warren Stewart, also of the Baldwin County Sheriff's Department, testified that he, Officer Ken Lee of the Gulf Shores Police Department and Steve Stewart arrived at the Jack Edwards Airport in Gulf Shores around 6:30 p.m. It was dark at the time of their arrival. Sheriff Benton and Sergeant Bourne also drove to the airport and parked their car beside Deputy Stewart's. Both cars were unmarked.
Deputy Byrd had testified that the above group of law enforcement officers were at Jack Edwards Airport "on a detail to watch for a shrimp boat that was coming in with some marijuana." There is no indication in the record that the officers were located at the airport for any other purpose.
Deputy Stewart testified that when they arrived at the airport they observed the airplane in question parked on the grass about ten to twenty feet off the east-west runway on the west end. The airplane was unoccupied when they arrived. No one saw the plane land.
Later, Deputy Stewart saw a white and blue Buick occupied by appellant and Mrs. Faye Hardy drive over to the airplane. Stewart said, "We watched Mr. Pianzio get out of his vehicle. He went to the plane. And we watched him unload several boxes out of the aircraft into the vehicle." Mrs. Hardy remained in the car. Deputy Stewart testified that "they got through just before we walked up to them." Prior to their approaching the appellant, the law enforcement officers at the airport had received the "BOLO" information concerning the airplane through a briefing on the matter by Chief Criminal Investigator Bobby Stewart.
The first thing appellant said when approached at the airport was "Oh, you're the police?" When questioned about what he was loading into the Buick appellant replied, "electrical supplies." Appellant allowed the officers to look inside the airplane, but no contraband was discovered.
Deputy Stewart testified that he then told Mrs. Hardy he wanted to search the car because of "the suspicious circumstances." Mrs. Hardy replied that "there were electrical supplies in the boxes and that she couldn't permit us to search the boxes, the contents of the boxes at this time." Deputy Stewart stated that "Mrs. Hardy got upset with us. She couldn't understand what we were doing and she attempted to drive away. I had to put the car in park and take the keys out of it."
Between 9:00 p.m. and 10:00 p.m., Deputy Byrd was dispatched by Sheriff Benton to the home of Judge Phyllis Nesbit in Fairhope to obtain search warrants for the airplane and Buick automobile. Another magistrate had earlier refused to issue the requested search warrants. Byrd did not go to the airport prior to the time the search warrants were obtained. After Judge Nesbit issued them, Byrd did not participate in their execution, but sent them by another deputy to Sergeant John Galloway who was at the airport.
Deputy Byrd admitted that prior to the time he obtained the search warrants no one had told him they had seen contraband *263 on the airplane. Byrd only knew that the airplane was parked at the airport and that some boxed materials had been taken from the plane and loaded into an automobile. Byrd also admitted that no one at Customs told him that contraband was in the airplane or in a Buick automobile, "just that they suspicioned it" being on the airplane. No one from Customs sent Byrd information that the airplane or the Buick automobile was at Jack Edwards Airport. Byrd testified that the Customs officials he talked to on the telephone in Foley did not tell him anything about the automobile. Byrd acknowledged that Customs officials "had no knowledge that a car was out there; they didn't even know a car was out there."
Deputy Warren Stewart testified that the searches were conducted around 10:30 p.m. The reverse side of the search warrants indicates that the search warrant for the Buick was executed at 10:41 p.m. and the one for the airplane was executed at 10:55 p.m. Deputy Stewart admitted that he did not know what was in the boxes until he opened them and that no one had told him what was in them before he opened them.

I
When the foregoing facts, which were brought to light at the suppression hearing, are compared with the information contained in Deputy Byrd's affidavits, it becomes unequivocably clear that the statements made in the affidavits are false. And, because the information Deputy Byrd swore to in the affidavits is so far afield from the actual information he had, the conclusion is inescapable that the falsity of the affidavits was made knowingly and intentionally or with reckless disregard for the truth.
Although all of the contraband was discovered in the Buick automobile and not in the airplane at the time the search warrants were executed, for the purpose of clarity we shall discuss the falsity of the affidavits to both warrants. It must first be noted that the affiant, Byrd, had not been to Jack Edwards Airport prior to his obtaining the search warrants from Judge Nesbit. He had not seen the airplane or Buick automobile before giving his sworn affidavit that he had "reason to believe" contraband was being concealed in them. Byrd had no personal knowledge that the airplane or Buick automobile was located at Jack Edwards Airport, much less that they contained contraband. Therefore, any information Byrd had that would establish probable cause, which is a prerequisite to obtaining any search warrant, had to have been obtained through hearsay. Probable cause may be based solely upon hearsay information under certain well defined circumstances. Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Clenney v. State, 281 Ala. 9, 198 So.2d 293 (1966); Waters v. State, 360 So.2d 347, 353 (Ala.Cr.App.), cert. denied, 360 So.2d 358 (Ala.1978).
From appellant's suppression hearing, the only possible sources through which Byrd could have obtained the necessary hearsay information to establish probable cause were U.S. Customs agents and Sheriff Benton. Byrd had received a "BOLO" bulletin in Foley around 5:00 p.m. on the date in question. While at Gulf Shores he had a telephone conversation with Customs officials in New Orleans later that evening. Byrd was dispatched per radio communications by Sheriff Benton to obtain the warrants from Judge Nesbit. Byrd had no other sources of information concerning this case.
Reviewing Byrd's affidavits, the only facts even vaguely connected with Sheriff Benton are found in the Buick automobile search warrant: "Baldwin County Deputy Sheriffs saw something being transferred from an airplane into the subject Buick." (Emphasis added.) It requires no recitation of authority to hold the above quoted portion of Byrd's affidavit inadequate to establish probable cause. Nothing whatsoever pertaining to information received from Sheriff Benton is contained on Byrd's affidavit to the airplane search warrant.
*264 Byrd's only remaining source of information is U.S. Customs; the "BOLO" bulletin received around 5:00 p.m. and the telephone conversation with Customs officials later in the evening. The "BOLO" bulletin Byrd received was no more than a directive to be on the lookout for the Aero Commander airplane. Through the telephone conversation later in the evening, Byrd learned that the airplane had landed in Marianna, Florida, that one of its occupants had been arrested, and that the pilot had taken off in the plane. The Customs official Byrd talked with also "suspected" or "suspicioned" that the airplane "might be carrying some type of contraband." As stated previously, this is all the information Byrd received from Customs.
Byrd received no information from Customs that the airplane was located at Jack Edwards Airport after it had taken off from Marianna, Florida. Byrd received no information that the airplane actually contained contraband, only that it was "suspected" or "suspicioned." There was no mention from Customs that the airplane was carrying marijuana. It is apparent that it was beyond Customs' wildest speculation that a 1977 Buick automobile containing "controlled substances (drugs) and or mrijuana [sic]" was located at Jack Edwards Airport. U.S. Customs most assuredly did not have that information, nor had Byrd received any such information from Customs. Yet, Byrd's affidavit recites, "Information received from U.S. Customs dispatch...."
Clearly, the information in Byrd's affidavits regarding what he "received from U.S. Customs dispatch" is false. In Franks v. Delaware, 438 U.S. 154, 155, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978), the Supreme Court held:
"[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." (Emphasis added.)
Appellant in the case at bar certainly established by a preponderance of the evidence a reckless disregard for the truth in Byrd's affidavits. The facts alleged in the affidavit which served as a basis for the issuance of the airplane warrant were false in all respects leaving nothing to establish probable cause. The facts alleged in the automobile warrant were likewise false except for the remaining content: "Baldwin County Deputy Sheriffs saw something being transferred from an airplane into the subject Buick." As stated earlier, this small portion comes nowhere close to establishing probable cause.
Even had Byrd's affidavits been sufficient on their face, which we need not decide, the search warrants were invalid because material statements in the supporting affidavits were contradicted and proven erroneous by the testimony of Byrd himself. Waters v. State, 360 So.2d 347, 357 (Ala.Cr. App.), cert. denied, 360 So.2d 358 (Ala.1978). As was stated by our supreme court in Walker v. Graham, 228 Ala. 574, 154 So. 806, 809 (1934):
"[N]o one will be permitted to wrongfully procure the issuance of a process by practicing a fraud or imposition upon the court or authority, and seek shelter behind such a process...."
Thus, setting all the affidavits' false material to one side as we are required to do under Franks v. Delaware, supra, the affidavits' remaining content is insufficient as a matter of law to establish probable cause. The probable cause requirement of voluminous case law, as well as § 15-5-3, Code of Ala.1975, was simply not satisfied.

*265 II
The search of the airplane and automobile was defective for a second reason: the search warrants were executed in the nighttime. § 15-5-8 Code of Ala.1975 reads:
"A search warrant must be executed in the daytime unless the affidavits state positively that the property is on the person or in the place to be searched, in which case it may be executed at any time of the day or night. The issuing judge or magistrate must state in the warrant, according to the character of the affidavits, whether it is to be executed by day or at any time of the day or night."
The supporting affidavits before us state that the affiant, Byrd, had "reason to believe" with the phrase "he is positive" deleted with X marks. Despite the deletion of "he is positive," Judge Nesbit nevertheless authorized the search of the airplane and Buick automobile to be conducted at "anytime" and struck the word "daytime." We think this action exceeded her judicial authority. Section 15-5-8 mandates that "a search warrant must be executed in the daytime unless the affidavits state positively that the property is ... in the place to be searched...." (Emphasis added.) To allow a search warrant to be executed at a time other than "daytime" when the affiant cannot swear positively that the property is "in the place to be searched" is contrary to a plain reading of the statute. Both search warrants here were, in fact, executed in the nighttime. Therefore, the searches were conducted illegally and the fruits of such illegal searches were inadmissible at appellant's trial. See Pate v. State, 42 Ala.App. 350, 165 So.2d 127, cert. denied, 276 Ala. 706, 165 So.2d 128 (1964).
Appellant timely raised these issues in his motions and amended motions to suppress. Based on the evidence that came to light at the suppression hearing, appellant's motions were due to be granted. Without question, the property seized and later introduced at appellant's trial was the product of an illegal search, violative of appellant's substantial rights under the Fourth and Fourteenth Amendments.
REVERSED AND REMANDED.
All the Judges concur except DeCARLO, J., dissents.
DeCARLO, Judge, dissenting.
The majority of the court has determined that the search warrant in this case was defective because of the false information given by the affiant in the affidavit. Therefore, it holds that the resulting search and seizure of twenty-eight boxes containing approximately 700,000 "Methaqualudes" was illegal.
The conclusion of the majority that the search warrant was invalid is, in my judgment, correct. However, it is also my judgment that, even though the warrant was invalid, the search was constitutionally permissible based upon the probable cause plus exigent circumstances exception to the warrant requirement. See Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); Richardson v. State, Ala.Cr. App., 376 So.2d 205 (1978), affirmed, Ala., 376 So.2d 228 (1979); Baker v. State, Ala. Cr.App., 340 So.2d 854, cert. den., Ala., 340 So.2d 860 (1976); Daniels v. State, 290 Ala. 316, 276 So.2d 441 (1973).
Without question, if after the false material is set to one side, the remaining content can be used to establish probable cause for a search warrant, Franks v. Delaware, supra, then certainly it could be used to establish probable cause for a warrantless search.
In my judgment, the deputies properly approached appellant and Mrs. Hardy to question their activities at Edwards Airport. When a "reasonable suspicion, based on objective facts, [exists] that the individual is involved in criminal activity" it is permissible to detain that individual for brief periods of questioning. Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
Among the circumstances that can arouse a law enforcement officer's reasonable suspicion are his knowledge of the methods *266 used in recent criminal activity, the character of the persons engaged in such activity, the character of the particular area, and the behavior of the suspect who appears to be evading police contact. See Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1923); United States v. Davis, 561 F.2d 1014 (D.C. Cir.), cert. den., 434 U.S. 929, 98 S.Ct. 416, 54 L.Ed.2d 290 (1977). In all situations, the officer is entitled to assess the facts in light of his experience. United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); Terry v. Ohio, supra. Furthermore, as Mr. Justice Powell observed in his concurring opinion in United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 1882, 64 L.Ed.2d 497 (1980):
"[I]t is important to recall that a trained law enforcement agent may be `able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer.' (quoting Brown v. Texas, 443 U.S. at 52 n. 2, 99 S.Ct. at 2641 n. 2)."
The transcript of evidence of the suppression hearing reveals specific and articulable facts giving rise to a "reasonable suspicion" on the part of the deputies that appellant was engaged in criminal conduct. Appellant was unloading boxes from an airplane which had earlier evaded police apprehension in Marianna, Florida. While I am fully aware that mere suspicion, standing alone, is never a sufficient basis for a finding of probable cause, Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Rudolph v. State, Ala.Cr.App., 371 So.2d 962, cert. den., 371 So.2d 965 (Ala. 1979), I believe that the circumstances of this case rose above mere suspicion, ripened into probable cause, and, when coupled with the exigent circumstances present, justified the warrantless search. See Hancock v. State, Ala.Cr.App., 368 So.2d 581, cert. den., Ala., 368 So.2d 587 (1979). In my opinion, the following facts adduced at the suppression hearing provide the necessary probable cause:
(1) The deputies were informed by a "be on the lookout" (BOLO) bulletin, derived from U.S. Customs officials in New Orleans, that a black, silver, and yellow Aero Commander plane, suspected of carrying contraband, had landed in Marianna, Florida, from an overseas destination. One of the occupants of the plane had been arrested, but the pilot eluded apprehension and left with the plane. Even if all the false assertions included in the affidavit for the search warrant are subtracted, Franks v. Delaware, supra, these remaining true facts derived from the "BOLO" bulletin contribute to a finding of probable cause. Without question, probable cause may be based on the hearsay information of a radio bulletin. Paschal v. State, Ala., 365 So.2d 681 (1978).
(2) When the plane departed from Marianna, Florida, the pilot left behind a wallet indicating the name "Pianzio."
(3) A white male and a white female, later identified as Mr. Pianzio and Mrs. Hardy, drove up to the airplane. Mrs. Hardy remained in the car and Mr. Pianzio began unloading boxes from the aircraft into the vehicle.
(4) Appellant and his companion were observed between 6:30 and 9:00 P.M., on February 10, 1980, a time when it was totally dark.
(5) The events in this case took place at Edwards Airport. It is important to consider, and judicial knowledge may be taken, that Edwards Airport is not a busy, controlled facility. In Green v. Mutual Benefit Health & Accident Association, 267 Ala. 56, 99 So.2d 694, 697 (1957), the Alabama Supreme Court stated:
"It is customary for courts to take judicial knowledge of what ought to be generally known within the limits of their jurisdiction. This cognizance may extend far beyond the actual knowledge, or even the memory of judges, who may therefore resort to such documents of reference, or other authoritative sources of information as may be at hand, and may be deemed worthy of confidence. The rule has been held, in many instances, to *267 embrace information derived informally by inquiry from experts."
With the guidance from our Supreme Court in Green, supra, I note that Edwards Airport is a blacktop airstrip without control tower, lights, hangars, or personnel in short, an unattended airstrip. See Vogel v. State, Ala.Cr.App., Mo. 3 Div. 146 (Octomber, 1980). Certainly the nature of the airfield is relevant in determining the "character of the surroundings" in order to evaluate the actions of appellant, see United States v. Davis, supra.
(6) Appellant unloaded some twenty-eight boxes from the aircraft. He refused to allow the officers to look in the luggage compartment of the plane. Mrs. Hardy told the officers that the boxes contained electrical supplies, and she, too, did not permit a search of the boxes. She became "upset" and attempted to drive away. Mrs. Hardy's evasive action undoubtedly is a strong contributing factor in the probable cause determination. See Sibron v. New York, supra. In addition, it does not seem plausible that individuals in the electrical supply business would be loading and unloading boxes at a dark, unattended airstrip. From aught that appears, the boxes bore no names, labels, or other indications that they were, in fact, electrical supplies. "Implausible explanations of suspicious behavior may, when considered with other factors, furnish probable cause." Vogel v. State, supra, and cases cited therein.
While I recognize that each of the above facts, considered separately, might not furnish the requisite probable cause for a warrantless search, I am of the opinion that, taken together, these individual facts were sufficient to establish probable cause for the deputies' belief that appellant was concealing contraband in the boxes. Probable cause does not call for absolute certainty. As the United States Supreme Court stated in Brinegar v. United States, supra:
"In dealing with probable cause, ... as the very very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."
I do not believe that it seriously can be contended that exigent circumstances did not exist to justify the seizure at the airstrip without a warrant. Although the presence of an automobile does not automatically dissolve the protection afforded by the Fourth Amendment, Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), it is clear that automobiles and other "moveables" have been treated differently when considered in the context of search and seizure cases, Coolidge v. New Hampshire, supra; Carroll v. United States, supra; Ex parte Reid, Ala., 388 So.2d 208 (1980).
In this case, there was not only an automobile, but also an airplane. Therefore, the presence of two "moveables", coupled with Mrs. Hardy's attempt to leave, certainly provides sufficiently exigent circumstances to allow the search and seizure without a warrant.
My conclusion that the search in this case should be upheld is further supported by the practical considerations and public policy observations of the United States Supreme Court in United States v. Mendenhall, supra:
"The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit. Few problems affecting the health and welfare of our population, particularly our young, cause greater concern than the escalating use of controlled substances. Much of the drug traffic is highly organized and conducted by sophisticated criminal syndicates. The profits are enormous. And many drugs ... may be easily concealed. As a result, the obstacles to detection of illegal conduct may be unmatched in any other area of law enforcement."
The Court also observed that
"[t]he jurisprudence of the Fourth Amendment demands consideration of the public's interest in effective law enforcement as well as each person's constitutionally secured right to be free from unreasonable searches and seizures." *268 Therefore, based on the foregoing facts and principles of law cited, I respectfully dissent.