William Melvin Herrin was convicted under an indictment charging possession of marijuana, not for personal use. After a jury trial he was found guilty and sentenced to three years and six months in the penitentiary. It was from this judgment that he appeals.
Prior to the trial, the court held a hearing outside the presence of the jury on a motion to suppress.
The evidence on behalf of the State tended to show that John Reid, an officer in the Alabama State Troopers for approximately five years, on September 25, 1974, was alone and patrolling Interstate 10, in Mobile County. He received a dispatch from the State radio which according to Reid, stated: ". . . be on the look-out for an old model Chevrolet occupied by three or more white males, possibly in connection with a holdup in Mississippi of a drug store." According to Reid, the radio dispatch said that the people wanted were white males with long hair and that the robbery had occurred in Pascagoula, Mississippi. He said the dispatch described the car as approximately a 1962 or 1963 blue Chevrolet. It was believed to have a Mississippi tag. However, Reid said that he did not remember whether the report had given the tag number, but stated the dispatcher said the car was either blue or tan.
Some minutes after receiving the dispatch, Reid saw a 1965 Chevrolet that was green with a brown front hood and fender. He followed the car and after getting behind the vehicle, he radioed the dispatcher. Reid thought he gave the dispatcher the tag number at that time but did not remember asking, "if it was a stolen tag." He did tell the dispatcher that he had stopped the car which could possibly be connected with an armed robbery. After Reid turned his blue *Page 105 
lights on, the car stopped just west of the Theodore-Dawes exist of Interstate 10. Reid said the car had a South Carolina license plate on the back.
After stopping the car, Reid asked the driver to come to his patrol car. Reid said the driver had either a South Carolina or Louisiana driver's license. After inquiring about the car's ownership, Reid called to the others, over his car's loudspeaker, to get out of the car. He then searched the occupants of the car but did not find anything. Reid said he then looked in the window and saw a small plastic bag of "plant material" on the right of the front seat, nearest the place where the appellant was sitting. He said he was outside the vehicle at the time and that the bag was in plain view.
Reid explained that he was suspicious of the people because of the description in the dispatch and the car's license plate being attached by what appeared to be a string looped over it. According to Reid, "it would take approximately five seconds to put one (license plate) on like that. It was hanging from the automobile." Further, he said that the people fit the description that he received and that he was going to search the vehicle for a weapon. Reid acknowledged that he was cautious because it was still possible that members of the group could have a weapon. Reid stated that his search was a "fast shake-down," but that he had "help coming."
When Reid searched the car, he found in the right front side, near the passenger's seat, an "AWOL" bag. He opened the bag and found at the bottom of it, underneath some clothes, a large plastic bag containing "plant material." Some letters addressed to the appellant were also in the bag. When questioned about his reason for searching the car, Reid said: "I was going to look for a weapon. . . ."
At that point, a State investigator was called and the occupants of the car were taken into custody.
At the completion of Officer Reid's testimony, the defense called Sgt. Ronald Bell, who was the post commander and the custodian of the records of the Highway Patrol. He showed the judge the radio log which contained all the communications coming into and leaving the radio dispatcher's office. Bell testified that the dispatcher had received a call, number 134, and it was sent out to all units about 4:45 P.M., September 25, 1974. It indicated that it was in reference to a robbery and a Mississippi tag, number 938-CEY. He said that the dispatch did not indicate whether the subjects in the car were white or black but explained that the log did not purport to be a verbatim report of what the dispatcher had said. Bell admitted the log contained no reference to the color of the vehicle.
On further questioning, Bell said the information appearing on the log depended mainly on the operator. He explained that in cases of alleged robbery the pertinent information appearing on the log should show, "the kind of vehicle, the tag number, the location . . . number of people in the car involved in the robbery, race, clothing or anything."
Upon the completion of Bell's testimony during the hearing, the State was asked to produce a picture depicting the rear of the 1965 Chevrolet in which the appellant and the others were riding. Officer Reid was then recalled and asked to identify the picture and to point out where the string holding the license plate was in the picture. He explained that it was either tied by wire or string behind the gas cap. Reid acknowledged that before he stopped the automobile he did not see the wire, but said: "I could tell it was loosely hung." Further, Reid stated that he could not tell what was holding the tag on until he had stopped the car.
At the end of Reid's testimony concerning the tag, the court announced it would reverse its ruling on the motion to suppress until the following morning. At that time, the attorney for the defendant made a motion to suppress the statement given by the defendant and the State called Alvin Abbott.
Abbott was employed in the Bureau of Investigation of the Alabama Department *Page 106 
of Public Safety. He testified that he saw the appellant sometime between 5:30 and 6:00 P.M. on September 25, 1974, in the lobby of the State Trooper's office. At that time he read the "Miranda" rights to the appellant. He stated that the rights were read to the appellant a second time and that the appellant read them just prior to making a statement. Abbott said that he asked the appellant if he wished to talk and the appellant said, ". . . he didn't have anything to hide."
According to Abbott, he asked the appellant if he wanted to write the statement and the appellant said that he would prefer that the officer write it. Abbott said that the statement was made in the secretary's office, but that before it was taken he informed the appellant of his rights the second time. The officer read the appellant a document containing the rights and told him before he could talk to him, he had to sign it. After reading each right to the appellant Abbott received no response until he got to the end of the form. He also asked the appellant to read the form and the appellant signed it.
No further evidence was presented after Officer Abbott's testimony and the motion to suppress the statement was denied.
The next morning, outside the presence of the jury, the court denied the motion to suppress the evidence which had been previously heard, and the jury returned to the courtroom. At that point the trial resumed and the State called Officer Reid.
Reid's testimony was substantially the same as that he had given during the suppression hearing. However, he did say during his examination in chief that he had seen marijuana many times and described how it looked and smelled. He testified that in his opinion the substance found in the car was marijuana. Reid said that the bag containing the "plant material" was not in the middle of the front seat but closer to the passenger's side. During the trial he identified a picture depicting the "AWOL" bag which he said contained four large bags of "plant material" along with letters and a diary belonging to the appellant. Reid said he placed the bag containing these items in the trunk of his car and carried them to the State Trooper's office where he turned them over to Sgt. Abbott.
Sgt. Alvin Abbott of the Department of Public Safety stated that Officer Reid had turned over to him a green bag with yellow letters containing clothing and a plastic bag full of "plant material." Abbott turned the plastic bags containing the "plant material" over to Jim Small, a State toxicologist.
Abbott said that he had advised the appellant of his"Miranda" rights on two occasions and that the appellant had signed a "waiver of counsel document." He afterwards took a statement from the appellant which the appellant signed and verified as true. Abbott identified the waiver of counsel document and the statement given to him by the appellant, and they were admitted into evidence.
James L. Small, a toxicologist for the State of Alabama, testified that he had on hundreds of occasions tested substances thought to be marijuana. During the trial he identified a box containing material that was given to him on September 26, 1974, by Sgt. Abbott. He said he identified the material as marijuana after making certain tests. Small stated there was a total of three and one-quarter pounds of marijuana, and that it was a plant coming from the genus cannabis sativa L. and containing a group of substances called tetrahydrocannibinols.
 I
It is contended that the stopping of the car occupied by the appellant and his companions was without probable cause and in violation of his Fourth Amendment Rights against unreasonable searches and seizures. The appellant maintained that the variance between the description broadcast and the description of the automobile stopped was fatal to the State's case.
The United States Supreme Court, in Terry v. Ohio,392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, recognized the "investigative stop concept." The court in Terry v. Ohio, *Page 107 
acknowledged that the government's interest in effective crime prevention and detection justified the recognition that:
 ". . . a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."
The court stated this was a legitimate investigative function.
In Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921,32 L.Ed.2d 612, the court said that:
 ". . . The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in the light of the facts known to the officer at the time." [Citations omitted.]
In Alabama the investigative stop concept was adopted in the following legislation, T. 15, §§ 118 (1) and 118 (2), Code of Alabama 1940, Recompiled 1958, 1973 Cum. Supp. to Vol. Five, which read:
 "§ 118 (1). Authority to stop and question. — A sheriff, or other officer acting as sheriff, or his deputy, or any constable, acting within their respective counties, or any marshal, deputy marshal, or policeman of any incorporated city or town, within the limits of the county or any highway patrolman or state trooper may stop any person abroad in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or other public offense, and may demand of him his name, address and an explanation of his actions.
 "§ 118 (2). Authority to search for weapons. — When a sheriff, or other officer acting as sheriff, or his deputy, or any constable, acting within their respective counties, or any marshal, deputy marshal, or policeman of any incorporated city or town, within the limits of the county, or any highway patrolman or state trooper has stopped a person for questioning pursuant to this chapter and reasonably suspects that he is in danger of life or limbs, he may search such person for a dangerous weapon. If such officer finds such a weapon or any other thing the possession of which may constitute a crime, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person."
In applying these principles to the present case, we find that Officer Reid acted justifiably in responding to the radio dispatch. Within some minutes after receiving the information concerning the alleged robbery, Reid saw an early model Chevrolet fitting the description of the car in the radio bulletin and occupied by four white males, three with long hair and one with shorter hair. Subsequently, the car was stopped on Interstate 10, just west of the Theodore-Dawes exit in Mobile County.[1]
Based on the information in the radio bulletin and due to the proximity of the area where the car was stopped to Pascagoula, Mississippi, the officer in this case had a reasonable basis upon which to stop the car.
We do not believe it was material that the Chevrolet stopped was a 1965 Chevrolet, rather than a 1962 or 1963 Chevrolet or green with a brown hood and fender, rather than blue. Further, that it had a South Carolina license plate rather than a Mississippi license is not material, due to the manner in which it appeared to be attached. A possibility of error in observation or transmission is sufficient to prevent us from requiring the exactitude urged by the appellant. *Page 108 
The appellant in support of his contention has relied onWhiteley v. Warden, Wyoming State Penitentiary, 401 U.S. 560,91 S.Ct. 1031, 28 L.Ed.2d 306. In that case, the Supreme Court of the United States declared that the police were entitled to act on the strength of the radio bulletin and that officers called upon to aid fellow officers in other states are entitled to assume that the officer requesting aid had the requisite information to support an independent assessment of probable cause. However, the Supreme Court said that where the contrary appears and the arrest was illegal, it could not be insulated from challenge because different officers made the arrest. Further, the probable cause for the arrest cannot be maintained on the basis of the communication to the arresting officer alone, if the warrant is later shown to be invalid. In Whiteleyv. Warden, Wyoming State Penitentiary, the primary illegality arose from the fact that the warrant was based on a sheriff's conclusory affidavit.
No assertion was made at the trial in the case before us that the facts supporting the dispatch were uncorroborated, but merely that it did not coincide with the facts confronting the officer.
The appellant also complains that the search of the automobile went beyond the scope of a reasonable search. He maintains the search went far beyond his or his companions persons and the area from which they might have obtained either a weapon or something that could have been used as evidence against them. Counsel argues that under these circumstances, there can be no constitutional justification in the absence of a search warrant for extending this search beyond the persons of the occupants of the car.
The record indicates, Officer Reid was alone at the time he confronted the appellant and the other occupants of the automobile. Reid said that he had made a "fast shakedown" at the time he searched the car's occupants, and that before stopping the automobile he had notified the dispatcher, and requested assistance. He testified that even though he had quickly searched the car's occupants, his subsequent search of the automobile was for weapons.
In the light of the facts known to Officer Reid, we think that he had the right and the duty to make a prompt investigation, which required as a matter of practical necessity that he stop the car and question its occupants. The stopping and questioning was not an arrest but was a reasonable course of action in view of the radio dispatch and the circumstances confronting Reid at the time. Under these circumstances it was also reasonable for the officer to search the car for weapons. Bassett v. State, 290 Ala. 259,275 So.2d 720. See: Devaney v. State, 55 Ala. App. 408, 316 So.2d 239.
 II
The appellant complains that the plain view doctrine will not justify the seizure of the marijuana seen on the front seat of the automobile ". . . where the incriminating nature of the object is not apparent from the plain view of the object." He argues that the application of the plain view doctrine is precluded in the instant case because the record of the suppression hearing ". . . provides an inadequate basis for determining that Trooper Reid knew or had reasonable belief to know that the substance he saw was marijuana."
Having decided that the initial confrontation was valid, and that the weapons search extended to the car, we conclude that the seizure of the marijuana found in plain view on the seat of the automobile was also valid.
The plain view doctrine is one of the delineated exceptions to the warrant requirement of the Fourth Amendment. It permits the seizure of items without a warrant if certain basic requirements are met. The three basic standards that must be complied with in order for a seizure to be judged permissible under the plain view doctrine were laid down in Coolidge v. NewHampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564. First, the doctrine requires that there be prior justification for an *Page 109 
intrusion. That this justification is present in this case should be clear from the preceding portion of this opinion. Second, the police officer must come across the evidence seized inadvertently. The facts adduced at the suppression hearing indicate that Officer Reid, pursuant to a radio bulletin, stopped the vehicle and after peering through the window, saw the package of marijuana. The third prong of the plain view doctrine requires that the objects discovered must be immediately recognized as evidence of wrong doing. It is not necessary that the recognition of the object as evidence be made beyond a reasonable doubt but only that the recognition satisfy a probable cause requirement. Shipman v. State,291 Ala. 484, 282 So.2d 700.
In this case, the State Trooper had reason to believe that he found something which should be investigated. Reid testified that when he looked through the car window he saw a package of "plant material," but went on to say that his concern at that point was to determine if there were any weapons in the car. Although Reid was not asked whether he knew the material was marijuana, the subsequent arrest for possession of marijuana suggests to us that he recognized the object he saw in plain view. Further, Officer Reid was a State Trooper with approximately five years experience and it is reasonable to infer that it was immediately apparent to him that what he observed was marijuana.
To say that Officer Reid did not recognize this substance as contraband defies reality. In this day and time there is a greater awareness of marijuana because not only of the many articles printed concerning this material, but information disseminated over the radio and television. The general public is more aware of marijuana than any other prohibited substance and its availability and use are widespread. Arrests for possession of marijuana are daily occurrences in our State. In our judgment, the type of packaging the marijuana was in, its location and the appearance of the "plant material" resulted in its immediate recognition.
In a recent decision, the North Carolina Court of Appeals has held that the plain view doctrine justified the seizure of pill bottles containing capsules, found on the dash-board of an automobile. It held this, even though, it was not determined until after later tests that the pills contained, not the medication described on the prescription labels, but illegal drugs. State v. Reid, 23 N.C. App. 194, 208 S.E.2d 699. The North Carolina court said:
 ". . . Having observed vials of pills and capsules in plain view on the dash-board of the defendant's vehicle, which vials they reasonably suspected
contained controlled substances, the officers here could reasonably conclude the vehicle contained other contraband which justified a complete search of the vehicle." [Emphasis added].
Due to the similarity of the factual situation in State v.Reid, and the one in the case at bar, we believe that an application of its reasoning is warranted.
Under the facts of this case we believe it is reasonable to conclude that what Officer Reid saw in plain view was immediately recognized as contraband by him. Compare: Danielsv. State, 290 Ala. 316, 276 So.2d 441.
 III
Under Coolidge v. New Hampshire, supra, once it became immediately apparent to Officer Reid that he had evidence before him of an incriminating nature, the extension of the original search to include a search of the "AWOL" bag was legitimate. Further, it was reasonable for Reid to believe that a weapon could have been hidden in the bag. Therefore the seizure of the marijuana in the "AWOL" bag was constitutionally valid.
We have searched the record and finding no error we affirm.
AFFIRMED.
All the Judges concur.
[1] We note that this area is not too distant from Pascagoula, Mississippi and the Alabama-Mississippi border. Also Interstate 10 is a highway between Mississippi and Alabama. *Page 110