The grand jury of Chambers County returned against Joel Mitchum an indictment, which charged that he did "unlawfully possess for sale marijuana, a controlled substance contrary to the provisions of the Alabama Uniform Controlled Substances Act."
Appellant was represented by retained counsel at arraignment and entered a plea of not guilty. The trial of the case was set, and appellant subsequently filed three motions, a motion for a change of venue, a motion for a continuance, and a motion to suppress the evidence. A hearing was held on the motions for a change of venue and for a continuance, and they were denied. A hearing was held immediately prior to trial on the motion to suppress and it, too, was denied. At the trial of the cause before a jury in Chambers County, the appellant was found guilty of possession of marijuana and *Page 1195 
was sentenced to a term of five years. After considering the appellant's application for probation, the court amended the sentence and ordered the defendant to serve four months in the county jail with the balance of the sentence on probation.
Prior to trial, a hearing on the appellant's motion to suppress was held outside the presence of the jury. The evidence submitted at the suppression hearing was as follows:
Detective Lt. Arthur Carmack, Jr., of the West Point, Georgia, Police Department testified that he had conveyed to Lewis Hammock, an investigator with the sheriff's department in Chambers County, the following information:
 I related to Lewis Hammock that the informant told me, that the week prior to March 21st, an $18,000.00 cocaine deal had gone down in West Point, Georgia. That, one Mr. Joel Mitchum was present when this cocaine deal went down. The informant stated, that during the week of March 21st, he had the occasion to be at Joel Mitchum's home, on the F.O.P. Road, and he had seen marijuana and cocaine, he had seen it sold there at that home."
Further, Carmack testified that he discussed with Chambers County District Judge Howard Bryan the same information which had been given to Hammock. However, the witness said that the information had been give over the telephone to Judge Bryan and was not given under oath.
Also, Carmack testified that, in the past, he was given information by this informer which had led to three convictions.
During cross-examination, Carmack said that the informant had related that he had been to Joel Mitchum's house the week of March 21st that he had seen cocaine and marijuana there at the residence, and that he had seen it sold from that residence.
According to Carmack, the informer stated that the house was located on "F.O.P. Road," but he did not identify which house. Carmack stated that the informer asked "if I knew where the F.O.P. Road was, off Highway 50, the Lafayette Highway, and I told him I did." Also, Carmack said that the informer revealed that "they kept some in the refrigerator" and that he told Hammock "to be sure and look in the refrigerator."
According to Carmack, he saw Hammock later that morning in West Point, Georgia, where Carmack again relayed to Hammock the information which he had received from the informant. Carmack acknowledged that, after this conversation, he had a telephone call from either Hammock or Judge Bryan, with whom he discussed the same information he had previously given Hammock in person and over the telephone.
During Carmack's testimony at the suppression hearing, the court, at the request of the defense attorney, verified that there had been arrests and convictions resulting from the information given to Carmack by the informant.
During further cross-examination, Carmack stated that the information he had received from this informant had always proved to be true. Carmack said that the informant did not use cocaine, but he knew cocaine when he saw it.
After continued cross-examination by the defense attorney, Carmack stated to the court that he felt answering any further questions could expose the identity of the informant. The court, at that time, ruled that the witness did not have to answer any further questions concerning the "$18,000.00 cocaine deal."
Investigator Lewis Hammock of the Chambers County Sheriff's Department testified that, on March 21, 1979, he received a telephone call from Carmack, who stated that he had been informed of two places in Chambers County where drugs were located on that particular date. Hammock subsequently drove to West Point, Georgia, and talked to Lt. Carmack, who again gave Hammock the same information.
After returning to Alabama, Hammock went to the appellant's residence and obtained a description of the property in order to procure a search warrant. Hammock testified that he discussed the information *Page 1196 
with Judge Bryan and that Judge Bryan, at that time, telephoned Lt. Carmack. According to Hammock, Bryan issued a search warrant based on the information Carmack had given Hammock and on the information Judge Bryan had received during the telephone conversation.
After obtaining the search warrant, Hammock, along with Deputies Lovelace, Gilbert and Williams, served the search warrant on the appellant on March 21, 1979, about 5:30 P.M. Hammock testified that the sun was shining when the warrant was served and that Mitchum was standing in his yard talking to a person whom Hammock did not identify.
During cross-examination, Hammock again stated that he told Judge Bryan about Carmack's information that the informant had seen marijuana and cocaine at the Mitchum's residence. Hammock acknowledged that the affidavit for the search warrant had not been typed or presented to him until after Judge Bryan had talked to Carmack over the telephone.
Hammock also acknowledged that the affidavit was compiled from notes which Judge Bryan had made of the conversation with the witness and with Carmack.
The witness stated that Carmack had been informed that the appellant's house was a "brown brick house, on the F.O.P. Road . . ." Hammock mentioned that he was familiar with the appellant prior to talking with Carmack and that he knew where the appellant lived because he had gone to his house on one previous occasion. Hammock added that, according to Carmack, the informer was reliable. Hammock stated that Judge Bryan had telephoned Carmack to verify what Hammock had said.
At the end of Hammock's testimony on the motion to suppress, the defense moved to exclude the evidence obtained under the search warrant, based on grounds previously stated in the motion to suppress and on additional grounds.
The court denied the motion to exclude and the defense called James P. Morgan, Sheriff of Chambers County, as a witness on the motion to suppress. Sheriff Morgan testified that he was on duty the morning of March 21, 1979, but he was not sure whether he worked that afternoon. According to Morgan, he was told that the arrest occurred that night.
During cross-examination, Sheriff Morgan stated that his deputies had the "same authority and responsibilities that I have."
Jimmy Chapman testified that he lived within a mile or a mile and a half from the Mitchums. On March 21, 1979, at approximately 6:30 P.M. he went to the appellant's house. He explained that he left his dogs there that morning and picked them up after work. According to Chapman, an individual by the name of Jackie Turner was there with the appellant. Two other people, whom the witness did not know, were also there. Chapman testified that he stayed there only long enough to pick up the dogs. Chapman added that, when he left the appellant's house, he met Steve Billingsley "coming down the F.O.P. Road going toward Joel's house."
Chapman denied seeing any "Chambers County deputies" at the Mitchum residence on that occasion. He added that his visit to appellant's house occurred after sundown.
During cross-examination, Chapman denied seeing any scales on the kitchen table, but added that he went through the living room, not the kitchen. He also said that his statements regarding time referred to "Eastern time."
Steve Billingsley testified that he knew that Mitchums and that he had gone to their house on March 21, 1979. Billingsley stated that he and the appellant usually ate oysters together on Wednesday nights and that he had gone to the house to pick up the appellant for that reason. He arrived there about fifteen minutes until seven o'clock and found the appellant, Jackie Turner, and two other persons who were unknown to the witness. Billingsley saw members of the Chambers County Sheriff's Department arrive about 7:05 P.M. He said that he and the appellant were in the car ready to leave when the men arrived. *Page 1197 
During cross-examination, Billingsley stated that he did not see a "Corvette T-top" nor did he see any scales in the appellant's home. Further, Billingsley said that, after members of the Chambers County Sheriff's Department came to the Mitchum home, everyone went inside. Later, the appellant told Billingsley that he could leave. Billingsley stated that the deputies were at Mitchum's house when he left.
At the completion of Billingsley's testimony, the case was begun before the jury and the following testimony was presented:
Detective Carmack testified before the jury, and his testimony at the trial was substantially the same as his testimony at the suppression hearing.
Hammock testified that, on March 21, 1979, he saw Lt. Carmack in West Point, Georgia. According to Hammock, after the conversation with Carmack, he "checked out" the appellant's house in order to get a description of the residence and to learn how to get to the house. Hammock testified that the appellant's house was "a brown house located on the F.O.P. Road, approximately four-tenths of a mile from the railroad tracks." Hammock took notes on the description and location and went to District Judge Bryan to obtain a search warrant.
At this point in the trial, the court removed the affidavit from the search warrant and received the search warrant without the affidavit into evidence.
According to Hammock, after he and the other officers arrived and entered the Mitchum house, the appellant advised the officers that his wife was nude in the utility room. The appellant, at that time, was allowed to go to the bedroom and get some clothes for his wife. Hammock stated that it was daytime and that, in his search of the refrigerator, he found a small medicine bottle which contained white powder. Further, he said that he also found a small diary, a scratch pad, and an address book on the bar which separated the dining area from the kitchen. These books were admitted into evidence over defense's objection, and Hammock stated that these, along with other articles obtained in the search, were collected and placed in plastic bags. According to Hammock, the articles were inventoried at the jail, then placed in the filing cabinet. The next morning, he removed the articles and took them to the lab.
During cross-examination, Hammock said that the search warrant was given to him at approximately 4:00 P.M., Eastern time and that, in addition to searching the refrigerator, he searched the outside of the Mitchum house. Hammock did not search the vehicles, nor did he search the Mitchums.
Greg Lovelace, a captain in charge of the day shift of the Chambers County Sheriff's Department, testified that, on the day in question, he took part in the search of the Mitchum residence, along with other officers. Lovelace stated that it was daylight when they arrived at approximately 5:30 P.M., and that the Mitchum residence was a brown brick house with an open carport. According to Lovelace, he entered the house and proceeded to the kitchen area, where, on the kitchen table, he found a set of scales, a toothbrush, a couple of metal spoons, a small plastic sifter, several sandwich bags, and one small bag which contained white powder. He explained that the bag which contained the white powder appeared to be the corner of a sandwich bag. Lovelace said that he searched the mantel on the fireplace and found "a reasonably large plastic bottle containing some black capsules." He testified that this container was in "open view." Next to the couch he found, on a metal tray, three clear plastic bags containing "a greenish brown vegetable matter." On the same tray, he also found one small plastic bag which contained some black capsules. Lovelace stated that, to the right of the couch, there was a "cedar chest" and that, in the chest, he found a small, clear plastic bag which contained "crystal" white powder. Also, in the cedar chest he found a cardboard box containing black capsules.
According to Lovelace, all of these items were placed on the kitchen table with other evidence found during the search. Lovelace stated that, during the search, Mrs. Mitchum *Page 1198 
came from the rear of the house with a blue money bag. He said that she placed the money bag in the fireplace, and, at that time, Lovelace asked if he could see the bag. The money bag was handed to him, and it contained a brown paper sack with photographs, a quantity of money, and a clear plastic sandwich bag containing white powder. Lovelace explained that this powder "was crystalized," too. Lovelace said that, inside the paper sack, they found four clear plastic bags containing a "greenish-brown vegetable matter." He stated that these bags, the bag containing the white crystalized powder, and the other evidence, were taken to the jail along with the Mitchums. According to Lovelace, the money bag was laid on the mantel after the brown paper sack and its contents had been removed and turned over the him. Lovelace admitted that the appellant had made no attempt to hide the articles found on the serving tray. Lovelace stated that he was not aware that the scales found in appellant's kitchen were the type used by veterinarians and that he did not know the appellant clipped dogs.
During further examination, Lovelace stated that two weapons, a twenty-two caliber pistol and a double barrel shotgun, were found in the house. The witness denied seeing any "dog trimmings" on the table or on the floor, nor did he see any clippers on the kitchen table. Further, he said that the powder he saw around the scales on the table did not resemble any gunpowder which he had seen.
Deputy Charles Mark Williams participated in the search of the appellant's residence along with other officers. Williams stated that, when they arrived at the appellant's house, Hammock presented the copy of the search warrant to the appellant, who was talking to someone in the yard.
After the appellant was allowed to take clothes to his wife, Williams entered the bedroom and began to search. According to Williams, he found on top of the chest of drawers, a spoon which contained a powder residue. He also found, on the dresser, several bags containing powder and "a metal object that had a ball on one end, — [a] clip was attached to a paper, a piece of paper wrapped around some brown looking material . . ." Williams said that, in the bathroom, he found a handful of "greenish-brownish vegetable looking material in the commode." Also, at the end of the hall he found "a wooden box containing approximately twenty-five or thirty orange tablets."
After finding the tablets, Williams was sent by Capt. Lovelace to the front of the house to guard the evidence which was on the table and to guard the appellant and his wife who were in custody.
Williams stated that he recalled seeing the blue money bag in a "pocket book" in the master bedroom. He said that when he "unzipped the bag" and saw money inside, he zipped the bag closed and informed Hammock and Mrs. Mitchum of what he had found. Williams saw the money bag when the appellant turned it over to Capt. Lovelace. According to Williams, Capt. Lovelace, at that time, unzipped the bank bag and took out a brown paper sack which contained "greenish-brownish vegetable material." Also found in the bank bag was a small plastic bag containing a "white powder substance." Williams testified that, during this period, the appellant appeared to be "anxious."
During cross-examination, Williams said that he did not recall accompanying the appellant to the back bedroom to get clothing for his wife, nor did he recall the appellant yelling "anything" to his wife when the officers arrived at the house.
Robert Stanley Gilbert of the Chambers County Sheriff's Department stated that, on March 21, 1979, he accompanied other officers to make a search at the appellant's residence. Gilbert stated that it was daylight when he and the other deputies arrived and that the first thing he noticed was the appellant standing in the front yard talking to someone. Gilbert was told to go to the back bedroom, where he found a plastic bottle containing some green-yellow capsules. *Page 1199 
Gilbert testified that he had known the appellant for about three or four years and that, in conversing with him after searching the bedroom, his demeanor was "kind of relaxed."
Gilbert recalled that he saw the blue money bag when one of the deputies asked the appellant to take it out of the fireplace. Gilbert stated that he did not see the blue money bag at the jail while the inventory was being made. He explained that the bag had been forgotten and that he, along with Lovelace and the appellant, returned to the house. When they arrived, the door was locked. They unlocked the door, the appellant retrieved the money bag, and they returned to the jail.
During cross-examination, Gilbert stated that they returned to the appellant's house at approximately "7:30 or 8:00 P.M. Central time." Further, he said that the return trip occurred about forty-five minutes after they had originally left the house.
Hammock was recalled by the State. He testified that, when the officers left the appellant's residence after the search, the blue money bag was not in his possession. He said that the money bag was turned over to him some thirty to forty-five minutes after they had returned to the jail. According to Hammock, he did not examine the contents of the blue money bag when it was turned over to him. The bag was placed in a safe-deposit box in the bank across the street from the jail.
Taylor Nogel, a Drug Chemical Coordinator for the Department of Forensic Sciences, stated that on March 22, 1979, he received a box from Hammock. The witness stated that he analyzed the contents of the box and found some of the items were not controlled substances. Nogel testified, however, that some of these items could be used to make controlled substances. Several of the items taken from the appellant's house did prove to be cocaine and marijuana, both of which were controlled substances. He stated that State's Exhibit No. 8, the powder which was contained in the small plastic bag, revealed the presence of cocaine as did the residue in the spoon taken from the Mitchum's residence.
According to Nogel, the contents of the four zip-lock plastic bags containing the vegetable matter did show, after being analyzed, the presence of marijuana. Nogel testified that the marijuana found in the items turned over to him from the search of the appellant's house, equaled a total weight in grams of 78.50. Also, he stated that the total weight of cocaine which he analyzed was 0.2319 grams, plus a small amount of residue. He testified that there are 28.3495 grams in an ounce.
Nogel also stated that, in his analysis of the pills turned over to him, he found only one-half of a tablet which contained a controlled substance.
During cross-examination, Nogel testified that one of the non-controlled substances could be converted to a controlled substance by a person who is not a trained chemist if that person were given a step-by-step procedure. Nogel acknowledged that the procedure "was not extremely involved."
Robert Stanley Gilbert was recalled, and he testified that the blue money bag contained $2,730.00 in cash. The money was admitted into evidence over the objection of the appellant.
During cross-examination, Gilbert acknowledged that the appellant's wife did own and operate a beauty shop.
At the end of Gilbert's testimony, the defense moved to exclude the State's evidence on the ground that there existed a fatal variance between the pleading and the proof regarding the crime alleged in the indictment. He argued also, that a prima facie case had not been proved and that the testimony was based on illegal evidence obtained under a search warrant not issued on probable cause.
 I
The appellant maintains that the affidavit supporting the search warrant did not aver sufficient probable cause to sustain the issuance of a search warrant for the property which was the subject of the search.
The supporting affidavit, omitting the formal parts, reads as follows: *Page 1200 
 "My name is Lewis Hammock and I am a Deputy Sheriff with the Chambers County Sheriff's Office. I know Arthur Carmack and I know that he is a Lt. on the West Point, Georgia, police department. I talked with Lt. Carmack on March 21, 1979. Lt. Carmack told me that he had received information concerning the described premises from a reliable informant. Lt. Carmack said that informant has provided accurate information on at least three occasions where such information led to arrests and convictions. Said informant is familiar with the appearance of cocaine and marijuana and knows each substance when he sees it. Informant has seen cocaine and marijuana sold inside the described premises within the last week."
The search warrant, omitting the formal parts, reads as follows:
 "Affidavit having been made before me by Lewis Hammock that he has reason to believe that on the premises known as [a] brown brick house trimmed in white with black shutters. To reach said house travel toward Cusseta from the cross roads in Huguley where Huguley School is located. Turn onto FOP Road going generally toward U.S. Highway 50. Cross railroad tracks and said house will be located on the left .4 mile past railroad tracks said premises includes any out buildings.
 "[T]here is being concealed certain property, namely COCAINE."
The test for determining whether probable cause existed for the issuance of a search warrant was set out in Aguilar v. Texas,378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723. This court has, on many occasions, re-stated the Aguilar "two-prong test" as it was applied in Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584,21 L.Ed.2d 637. In Spinelli, the Supreme Court emphasized that an affiant must make more than a conclusory statement concerning the reliability of the informant and must support the tip which was given with facts to show why the conclusion that defendant was in possession of contraband or was committing illegal acts was reached. See Pilkington v. State, Ala.Cr.App., 343 So.2d 548.
As to the first prong in the Aguilar test, "the veracity prong," concerning the reliability of the informer, evidence shows that the affiant, Hammock, asserted that the informant had "provided accurate information on at least three occasions" and the information had led to arrests and convictions. Judge Bryant, during the suppression hearing, verified this information. These facts, in our judgment, were sufficient to justify the conclusion that the informer was credible or that his information was reliable. Further, the facts were certainly sufficient to enable the magistrate to make a judicial determination of reliability. See Waters v. State, Ala.Cr.App., 360 So.2d 347; Neugent v.State, Ala.Cr.App., 340 So.2d 55; Bates v. State, 51 Ala. App. 338, 285 So.2d 501.
Regarding the second prong of the Aguilar test, the "knowledge prong" which requires some knowledge of the underlying facts to support the conclusion that a crime had been, or is about to be committed at the premises to be searched, the affiant in the present case stated that the informant had seen "cocaine and marijuana sold inside the described premises within the last week." Further, the affiant averred that the informant was familiar with the appearance of cocaine and marijuana and knew each substance when he saw it. This information was based on personal observation in sufficient enough detail to enable a detached magistrate to conclude that the evidence was probably located at the place sought to be searched. A detached magistrate could preclude that these allegations were based on suspicion, casual rumor, or an off-hand remark heard at the neighborhood bar. See Yielding v. State, Ala.Cr.App., 371 So.2d 951.
It was not necessary that the affidavit state who owned the premises where the controlled substances were found. Cabble v.State, Ala.Cr.App., 347 So.2d 546. Also, the description given in the search warrant was sufficient. That description *Page 1201 
would enable a prudent officer to locate the premises with reasonable certainty. The testimony shows that Hammock was familiar with the house described as a "brown brick house trimmed in white with black shutters," which belonged to the appellant. Hammock mentioned during his testimony that he was familiar with the appellant's house and its location. See Neugent v. State, supra, and Hutto v. State, 50 Ala. App. 636, 282 So.2d 75.
The appellant has stated that the magistrate's failure to examine, under oath, the witnesses relied upon in determining the existence of probable cause was in violation of § 15-5-4, Code of Alabama 1975. Although the substance of the conversation which the magistrate, District Judge Bryan, had with Officer Carmack over the telephone is not made part of the record, there is no evidence to suggest that the judge learned anything from Carmack which he had not already heard from Hammock. In fact, during the suppression hearing, Hammock testified that the judge's conclusion was based on the information which he had given to the judge and on the judge's telephone conversation with Lt. Carmack. This court, in Oliver v. State, 46 Ala. App. 118, 238 So.2d 916, addressed a similar issue. There, this court stated that the magistrate's failure to reduce the evidence to writing would not vitiate an otherwise valid search warrant. Therefore, the magistrate in this case had been provided with all the necessary "facts," which had been sworn to by Hammock.
The affidavit in the present case was sufficient and did not lack corroboration. The supporting facts of the affidavit, although hearsay, were augmented by a statement that the informant had provided reliable information in the past. Under these facts, the information supplied to the magistrate was not "hearsay alone." In Neugent v. State, supra, the fact that the informant observed the drugs at the house, coupled with a statement that they were being sold and that he had observed the sale during the past week, was sufficient.
Regarding the contention that the information did not meet the "time test" of Davis v. State, 286 Ala. 117, 237 So.2d 640, we are of the opinion that there were sufficient facts to show that the information given in the affidavit was in fact "fresh." The affidavit contained a statement that the informant had seen cocaine and marijuana sold inside the described premises "within the last week." Under these facts, we distinguish Davis. In the present case, the affidavit incorporated the date of March 21, 1979, indicating when Carmack received the information from the informant. In Davis, no such date appeared. We believe that the information was not remote and contained the requisite "freshness."
In support of his contention that the information asserted in the affidavit was remote rather than "fresh," the appellant citesHorzempa v. State, 292 Ala. 140, 290 So.2d 220. In Horzempa, although the affidavit stated that drugs were purchased on several occasions "recently," the court said, "What is meant by `recent' is incapable of exact or precise definition. . . ." Also, in Horzempa, the Alabama Supreme Court said that the affidavit failed to show "that the informants had purchased drugs `recently' in the house or that they had actually seen drugs `recently' in the house." The Supreme Court stated that the informants did not say that they had "recently seen" drugs in the residence, therefore, if the affidavit included that the drugs been recently seen in the residence, the affidavit would have been sufficient. See Buckles v. State, 50 Ala. App. 548,280 So.2d 810.
In the case at bar, "within the last week" incorporates a definite period of time which at the most would mean six days ago. Under these circumstances, we believe that the facts outlined in the affidavit were sufficient to assure the necessary "freshness" of the information.
As to the question concerning the re-entry of the appellant's residence, after the original search had been made, we are of the opinion that this re-entry did not constitute a search and was made only to *Page 1202 
retrieve something which had already been found. The re-entry occurred some forty-five minutes after the original search had ended and the residence was re-entered merely to get the money bag which had inadvertently been left behind. No searching or probing occurred at that time. Under these particular circumstances, it is our judgment that the obtaining of a second search warrant before entering the premises the second time was not necessary.
Further, it is our judgment that the affidavit supporting the search warrant in the present case, met the two-prong test laid down in Aguilar v. Texas, supra, despite the fact that the information relayed to Hammock by Carmack could be considered hearsay based on hearsay. In our judgment, such information was acceptable as long as both levels of hearsay meet the two-prong test spelled out in Aguilar v. Texas, supra.
It is our judgment that the affidavit supporting the search warrant met the constitutional requisites, and the ultimate search of the appellant's residence was permissible.
 II
The appellant contends that the law enforcement officers executing the search warrant conducted a constitutionally impermissible general exploratory search.
During the search for cocaine of the appellant's premises, cocaine was found and several other items of a suspicious character were discovered. In our judgment, the seizure of these additional items was justified under the plain view doctrine. The requirements of the plain view doctrine, an exception to the warrant requirement in the Fourth Amendment, are to be found inCoolidge v. New Hamshire, 403 U.S. 443, 91 S.Ct. 2022,29 L.Ed.2d 564. In Coolidge v. New Hamshire, supra, the United States Supreme Court indicated that the seizure of unnamed items was permissible where police officers have a warrant to search a particular residence for certain items and where, during the course of the search, they "come across some other article of an incriminating nature." The seizure of these articles does not conflict with the warrant requirement because the police have limited their search to the areas designated in the search warrant. Under these circumstances, an object in plain view and inadvertently discovered can be seized by the police. The court in Coolidge v. New Hamshire, supra, said:
 "Where, once an otherwise lawful search is in progress, the police inadvertently come upon a piece of evidence, it would often be a needless inconvenience, and sometimes dangerous — to the evidence or to the police themselves — to require them to ignore it until they have obtained a warrant particularly describing it."
Under Coolidge v. New Hamshire, supra, even though an item is found in "plain view" during a search with a search warrant naming other items, such occurrence does not, necessarily, justify the seizure of that particular item. The court inCoolidge v. New Hampshire, noted it must be an "article of an incriminating nature." See also Herrin v. State, Ala.Cr.App.,349 So.2d 103.
In the present case, the items seized during the search of cocaine, which was specifically authorized by the search warrant, were items "inadvertently discovered." These items were of a sufficiently suspicious nature to come within the "incriminating nature" requisite of Coolidge v. New Hamshire, supra. In Herrinv. State, supra, this court noted:
 "It is not necessary that the recognition of the object as evidence be made beyond a reasonable doubt but only that the recognition satisfy a probable cause requirement."
Further, this court in Herrin v. State, supra, adopted the rationale that the "plain view doctrine" authorizes a seizure of items which officers "reasonably suspect" contain controlled substances. The court in Herrin specifically pointed out that, although an article's "incriminating nature" is not discovered until after analysis has been performed, the seizure is not constitutionally impermissible where the officer, in the beginning, reasonably suspected the items *Page 1203 
contained controlled substances. In our judgment, the officers in this case could have "reasonably suspected" that the item seized contained controlled substances because of the circumstances existing at the time of the search. For example, the location of items, such as vegetable matter in the commode, the presence of paraphernalia which could be considered "drug paraphernalia," and the large quantities of items found, such as pills in the amount of 650, all are circumstances, which considered as a whole, authorized the officers to seize the various items.
The supporting affidavit in the present case, stated that the informer had seen cocaine and marijuana sold on the premises. Under the rationale of the "plain view doctrine" in Herrin v.State, supra, the seizure of the scales, the sack containing the white powder, the approximately 650 pills, the spoon with a powder residue, the money bag containing approximately $2,700.00, and the other items taken during the search of the appellant's residence was justified.
Therefore, the admission of these items was not error, and the motion to suppress was properly denied.
 III
The appellant asserts that the trial court erroneously received evidence of other crimes or misconduct. He maintains that the introduction of approximately 650 pills, sacks containing white powder, which was later determined to be lactose, and more than two thousand dollars in cash was "clearly calculated to prejudice the accused by wrapping the mantle of `drug pusher' about the defendant's shoulders."
The admissibility of evidence of other separate and distinct criminals acts is addressed in Brantley v. State, 294 Ala. 344,317 So.2d 345. There, the Supreme Court of Alabama stated that the admission of other drugs into evidence is permissible where the other items would show the "complete story." See alsoSatterwhite v. State, Ala.Cr.App., 364 So.2d 345; Smith v. State, Ala.Cr.App., 351 So.2d 668.
In the present case, the marijuana, the 650 pills, the scales, the money, and the packages containing lactose show the complete story of whether the appellant did unlawfully possess marijuana for sale. Therefore, the admission by the trial court of the other items was not error.
 IV
The appellant complains that certain remarks by the prosecutor during the qualification of the jury venire and during closing argument amounted to a comment on the appellant's failure to take the stand.
During voir dire examination by the prosecution, the following exchange occurred:
 "Hon. R.C. Wallace, Jr. — Is there anyone of you, if the evidence was presented to you, and it was not rebutted in any way, would you make an effort —
 "MIKE COOK: If it please the Court, we object, I, at this time, move to disqualify the whole jury venire at this time, because Mr. Wallace has just told the whole jury venire, if the State puts on evidence, and there is no rebuttal whatever presented, then, would you find the defendant guilty. Implying that the defendant has to take the stand and testify, and he emphasized `no rebuttal.'
"COURT: Motion denied.
"MIKE COOK: Respectfully reserve an exception.
 "COURT: You have your exception. Mr. Wallace, come here to the bench. (Out of hearing of jury venire) You know the defendant doesn't have to testify so keep away from that, and watch how you phrase your questions. Go ahead."
Also during the voir dire, the prosecution made the following comment, which the appellant says was a comment on the appellant's failure to take the stand.
 "R.C. WALLACE, JR: Alright. Say, they asked they just try one at the time. Then that person is not being tried, takes the stand and says, `it's mine, it wasn't my husband's' or, `it wasn't my wife's' then, whatever it was, was in clear view, or both parties had access to it at all times, whether or not you would give that any weight? *Page 1204 
"MIKE COOK: I object to this question, on the same grounds previously stated, it tries to give a false impression as to the law, it has done nothing but prejudice the minds of the jury, it's an effort to inhibit the defendant's fair trial, and on all the previous stated grounds, I still move to quash the venire.
COURT: You jurors can have a seat, thank you.
 "R.C. WALLACE, JR: They are not going to have to answer that question Judge?
 "COURT: No sir. You are getting back to the question of the defendant taking the stand.
 "MIKE COOK: I didn't want to state that at this time, Judge, but I want to put it on record, this is the second time the State has alluded to the necessity of the defendant taking the stand."
The first comment was incomplete, and the intent of the prosecutor cannot be truly comprehended. We also note that, due to the fragmentary nature of the comment, it is difficult for this court to determine whether this remark was in fact improper.
Regarding the second comment, we note that, during the voir dire examination, there were remarks by the prosecution that the defense attorney had raised the same issue. We also note that the defense attorney objected to the remark as an improper statement of the law and did not object on the ground that the remark was a comment on appellant's anticipated failure to take the stand.
In our judgment, it is difficult to perceive that the remarks made during the qualifying of the jury had the prejudicial nature attributed to them by the appellant.
The appellant has also complained that, during the closing argument of the prosecution, the following remarks, which the appellant contends were comments on his failure to take the stand, were made:
"CONTINUE WITH ARGUMENT BY JOEL HOLLEY:
 "And, I'm not going to take up any more of your time, because I think you are twelve intelligent people. Take this evidence back with you, and you look at it. And you remember that you are the enforcers of the law, the District Attorney's Office can't enforce the law, the police officers can only go so far, and the Court can only go so far. It's up to you all. And I want you to pay close attention to what the defendant has to say, and pay close attention to what the Court has to say. And, if you can reason away, taking what the Toxicologist said about the amount of marijuana here, that in his opinion you can make between 100 or 150 cigarettes — I don't smoke, but how many cartons of cigarettes do you all buy at a time? You go back there and reason away all this evidence, and you are either going to let this defendant go, and find him not guilty, or you going to come up with something beyond my reason." [Emphasis added]
The appellant insists that the foregoing remarks were improper because they were comments on defendant's failure to testify. In our judgment, these remarks by the prosecution were not improper. Clearly the remarks were a call by the prosecution for the jury to pay close attention to what the defendant had said and not to what he was going to say. At this point in the trial, all the testimony had been completed; therefore, no other evidence was forthcoming. We do not believe that any of the remarks made during the voir dire examination nor during the closing argument were comments on the appellant's failure to take the stand. Neither do we believe that these remarks taken in combination would constitute a comment on this appellant's failure to take the stand.
We have searched the record and transcript of evidence in this case and, finding no error, we affirm the judgment of conviction by the Chambers Circuit Court.
Affirmed.
All the Judges concurred. *Page 1205