Louis Sullivan was charged by indictment with murder in the second degree in the killing of Hillard Johnston, Jr., alias "Junior" Johnston, by shooting him with a .32 caliber pistol. The jury found the appellant guilty of murder in the second degree and the trial court sentenced him to ten years imprisonment.
The appellant filed motions for new trial and to set aside the verdict of the jury. The motions were overruled, following a hearing thereon. This appeal followed.
Norman Weaver, a neighbor of the deceased, and a first cousin of the appellant, testified the deceased was at his home in Fairford, Alabama on the morning of the murder, November 6, 1979, around 11:00 a.m. He observed the deceased and two other men, Dallas Chastang, Jr. and Bill Monroe Davis, leave his house walking towards the appellant's residence shortly thereafter. Approximately thirty minutes later, the appellant came to Weaver's house and the following conversation occurred:
 "A She was putting up a bed. I went in where she was at there. Louis come and knocked on the door, like that (indicating). He said I want you to help me. I said what do you mean, help you. He said I want you to carry Junior to the hospital for me. I said what's wrong with him. He said I shot him.
Q Louis said he shot Junior Johnston?
A That's right." (R.p. 116)
Mr. Weaver testified that appellant had been drinking and appeared to be "pretty *Page 78 
much drunk." Mr. Weaver then drove to Deputy Kessler Weaver's residence and reported the shooting at Jerry Weaver's house, where appellant resided.
Deputy Kessler Weaver testified he went to the Jerry Weaver house around noon November 6, 1979, in response to Norman Weaver's report of a shooting. The record reflects the following transpired:
 "Q When you arrived down there, what, if anything, did you find?
 A I found Hillard Johnston, Jr. laying on the floor with a bullet hole in his stomach.
Q Was he dead or alive?
A He was alive at that time.
Q Was anyone else there?
A No, there wasn't.
Q Did you see the Defendant, Louis Sullivan, there?
A Not when I first got there I didn't.
 Q Now, where was the deceased, Hillard Johnston, Jr., laying?
 A He was laying approximately two to three feet inside the bedroom door.
Q Inside of the bedroom door?
A Yes, sir.
Q Does that door open out into the front?
A Right.
 Q All right, sir. What else did you do after you got there, if anything, Kessler?
 A I tried to get his attention. I called his name about twice. I couldn't get no answer. At that time a Norman Weaver and his wife, Tollie Weaver, came on down behind me. And shortly after that, a couple of minutes, Louis Sullivan arrived.
Q Louis came back?
A Yes, sir.
Q All right, sir. And what did you do then?
 A At the time he walked up there, he said, well, he hit me on the shoulder twice is the reason I shot him. Just out of the spur of the moment I said you shot him. He said, yeah. I said I want to advise you of your rights. I advised him of his rights at the time and I sat him in the car.
 Q Did you place him under arrest when he said he shot Hillard Johnston?
A Yes, sir." (R.p. 128-130)
After reading appellant his rights, Deputy Weaver questioned appellant as to the location of the pistol. Appellant stated he threw it over the house. Both men looked for the weapon, but did not find it.
That same afternoon, after reading and signing a waiver of rights form, appellant gave a statement to police officials in which he admitted shooting the deceased after running out of the house into the yard to escape further blows from a chair wielded by the deceased. The following morning appellant took investigators to the pistol, which was located near a telephone pole a short distance from the scene of the murder.
Testimony by neighbors Dallas Chastang, Jr., and Bill Monroe Davis indicated they were present at the Jerry Weaver house the morning of the shooting, having been invited there by appellant to have a drink and listen to music. Both witnesses stated that appellant and the deceased had been drinking moonshine whiskey there that morning. However, both witnesses left the scene around 9:30, before the shooting. Neither man saw any sign of trouble between the appellant and the deceased at the time they departed. Bill Davis testified, however, that appellant did have a .32 pistol, which he had shown to Davis that morning, and had asked him how he liked it.
Doctor Leroy Riddick, a forensic pathologist for the State, testified he performed an autopsy on the deceased on November 7, 1979. The autopsy reflected the following:
 "Q All right, sir. Now then, did you make a determination, Doctor Riddick, as to the medical cause of death of the decedent?
 A The cause of death was a gunshot wound of the abdomen. As a result of the lacerating the artery, he bled over a quart of blood into his abdominal cavity." (R.p. 96-97) *Page 79 
Richard Carter, a firearms examiner for the State, testified that an expended cartridge case which he received from Deputy Jack Rivers in connection with the death of Hillard Johnston, Jr., was fired from the same .32 caliber pistol he received from Deputy Rivers. The same pistol was identified at trial as the murder weapon pointed out to investigators by appellant the day after the murder. He also stated his examination of the shirt worn by deceased at the time of the shooting evidenced that the shot could have been fired from a distance of no closer than three to four feet from the victim.
Eddie Slayton, a State investigator, testified he took a statement from appellant at the courthouse the afternoon of the murder at approximately 3:00 p.m., after appellant first read and signed a waiver of rights form. Slayton stated appellant appeared sober at the time he gave the statement. As well, Slayton read appellant his rights, in the presence of Sheriff Wheat, and appellant stated he understood his rights. Investigator Slayton also accompanied appellant the next morning to find the murder weapon.
Slayton's testimony on cross-examination by defense counsel revealed the substance of the statement to be as follows:
 "Q Did you put down the material parts of it you felt needed to go in the statement, didn't you?
A Yes, sir.
 Q Even with that, he told you that Junior Johnston came to his house about 9:00 o'clock that morning, that they sat around the house and had a few drinks. He told you that Junior had drank a pint of wine that morning, didn't he?
A Yes, sir, best I recall he did.
 Q And he told you Junior brought two pints of whiskey with him to the house, didn't he?
A I think so, yes, sir.
 Q And that he drank about half a pint of that whiskey, didn't he?
A That's right.
 Q The next thing he up and told you, Junior said he was going to knock the hell out of him?
 A That was several hours after sitting around talking and drinking.
 Q Junior told him he was going to knock the hell out of him?
A Yes, sir.
 Q He told you he did hit him twice. He asked him not to hit him anymore?
A Yes, sir.
 Q And Junior was coming out the door to hit him again?
A Yes, sir.
 Q And he had to step out of the house there to keep him from hitting him?
A Yes, sir.
 Q Then he says he shot him one time with a pistol to keep him from hitting him again, didn't he?
A Yes, sir.
 Q After that, didn't he say, I notice, `Don't let me die. I ran to my aunt's house and called the law. I don't know where the gun is.' That's what he told you that evening?
A That afternoon, yes, sir.
 Q `I went back to my house and Deputy Kessler Weaver was already there. Grace Weaver, my aunt, is where I called the law and an ambulance.' He told you in here he kicked the door open at his aunt's house because nobody was home to get this boy some help?
A I think that's right, yes, sir.
 Q Did y'all check on that to see whether he did or didn't?
A I personally — no, sir.
 Q You had no reason to doubt him telling you the truth, did you, Officer?
A No, sir." (R.p. 160-162)
The defense rested without presenting any evidence or testimony.
 I.
Appellant argues that the prosecuting attorney made an improper reference in closing argument to appellant's failure to take the stand to testify in his own behalf. The prosecutor's statement appears in the record as follows: *Page 80 
 "MR. TURNER: He had enough sense, ladies and gentlemen of the Jury, to fabricate a lie about killing Hillary (sic) Johnston in self defense but he did not think about the fact this body would be autopsied and proved without question that he lied to the officers and lied to you yesterday because there is no way —
 MR. GILMORE: Your honor, we object to the Defendant lied to this Jury.
THE COURT: I will let him argue —
 MR. TURNER: I thought I said the Defendant did in his statement.
MR. GILMORE: He said the Defendant did yesterday.
THE COURT: I will exclude that statement from you.
MR. GILMORE: We make a motion for a new trial.
THE COURT: The motion for new trial will be denied.
MR. GILMORE: We accept." (R.p. 173-174)
After carefully considering the prosecutor's statement and its intended and probable import, we are of an abiding conviction that this was not a statement made in reference to the appellant's failure to testify, but merely a permissible argument based upon evidence presented at trial. Binion v.State, 57 Ala. App. 234, 327 So.2d 729 (1975), cert. denied,295 Ala. 391, 327 So.2d 732 (1976). The prosecutor's argument was neither a direct nor an indirect comment on appellant's failure to testify. It was not incumbent upon the trial judge to exclude the statement, but it appears he did so out of an overabundance of caution to avoid any possible error. Smith v.State, Ala.Cr.App., 370 So.2d 312, cert. denied, Ala.,370 So.2d 319 (1979). Considering the circumstances of what transpired in the trial and the nature of evidence presented during the trial, we do not find error in the prosecutor's remark or in the trial judge's ruling thereon. Warren v. State,292 Ala. 71, 288 So.2d 826 (1973); on remand 52 Ala. App. 708,288 So.2d 832 (1974); Mitchum v. State, Ala.Cr.App.,384 So.2d 1193, cert. denied, Ala., 384 So.2d 1205 (1980).
 II.
At the conclusion of the trial court's oral charge, appellant excepted to the court's charge as follows:
 "THE COURT: Any exceptions or objections to the Charge?
 MR. GILMORE: I want to except to the part of the Charge on —
 THE COURT: I have one matter to take up outside your presence. I want you to remain in the jury box. Do not try to decide any issue in this case until your deliberations under instructions of the Court. I do not want anyone leaving the courtroom.
 (THE FOLLOWING OCCURRED OUT OF THE PRESENCE OF THE JURY.)
 MR. GILMORE: I except to the Court's Charge on the duty of the Defendant to retreat unless it's shown that he was in his home or place of work. When all the evidence is undisputed that he was in his home and owes no duty to retreat.
 THE COURT: I Charged, my Charge in regard to that was, a person is not, however, justified in using deadly physical force upon another person if it reasonably appears, or if he knows that he can avoid the necessity of using such force with complete safety by retreating, except that he is not required to retreat if he is in his dwelling or at his place of work and was not the original aggressor.
 I feel that is a correct statement of the law. I Charged them that.
 MR. GILMORE: All the evidence shows he was in his home. We except." (R.p. 188-189)
Appellant now argues for the first time on appeal that the court erred by failing to charge the jury that the defendant had no duty to retreat if he was in either the curtilage of his home, or within his actual dwelling.
Where the trial court errs in its oral instructions to the jury, the only remedy is for defense counsel to take exception thereto and substantially point out to the trial court the erroneous instructions. If the defense attorney fails to take such exception, *Page 81 
the matter can not be presented for the first time on appeal.Passmore v. State, 47 Ala. App. 189, 252 So.2d 115 (1971);Langley v. State, Ala.Cr.App., 383 So.2d 868, cert. denied,383 So.2d 873 (1980); Smith, supra. If the defendant wishes an extension of a properly given oral charge, he must do so by requesting and presenting to the court written instructions extending the court's charge. Taking an exception to the court's covered oral charge in this instance is insufficient to preserve the point for review. Passmore, supra.
It is evident to this court that the exception taken by defense counsel made no attempt to point out any error in the substance of the portions of the court's oral charge excepted to, but merely challenged the fact it was given at all. We find the charge on self defense under the evidence presented at trial was warranted and given in the defendant's best interest. Additionally, while appellant argues on appeal that the court should have extended its charge on self defense, no requested written charges were given to the trial judge. Hence, defendant failed to preserve any error for review and we must decline to consider any alleged error in the court's oral charge.Passmore, supra.
 III.
Appellant argues error to reversal occurred through the repeated admission of evidence in the nature of a confession, without the trial court first having conducted a hearing outside the presence of the jury to determine voluntariness. There was no motion made by the appellant to suppress such statements prior to trial, nor was any request made for a hearing outside the presence of the jury at any time during the proceedings.
The first instance appearing in the record indicates this statement by the prosecutor in opening argument:
 MR. TURNER: Louis Sullivan went to Norman Weaver's house and said call the ambulance, that he killed Hillard Johnston.
 MR. GILMORE: We object to what the Defendant told or any statement of the Defendant without first being hashed-out before the Court as to whether or not it was voluntary or not. And we move for a mistrial.
THE COURT: Deny your motion.
 MR. GILMORE: It puts it in the minds of the jury that the Defendant already made a statement of what he did and without it first being considered out of the presence of the jury. It biases and prejudices the jury against the Defendant.
 THE COURT: Do you want to take that issue up at this time?
MR. GILMORE: No, sir.
 THE COURT: I am going to overrule your motion, deny your motion." (R.p. 58)
The statement by the prosecutor appears to be no more than permissible argument as to facts he expected the evidence to reveal during the trial. A review of the record indicates this very evidence did come in, and properly so, at page 116 of the record, quoted supra in this opinion. Additionally, the trial judge gave the defense attorney the opportunity to take the issue up before the court, and defense counsel declined to do so. The trial court acted on defense counsel's refusal and proceeded with the trial. At no point did defendant request a hearing outside the presence of the jury. Defense counsel having waived the opportunity for a hearing on the matter at that time, he can not now argue error. A defendant may not by his own voluntary conduct invite error and then seek to profit thereby. Aldridge v. State, 278 Ala. 470, 179 So.2d 51 (1965); see also Collins v. State, Ala.Cr.App., 385 So.2d 1010 (1979), reversed on other grounds at Ala., 385 So.2d 1005 (1980).
Appellant also insists the court erred in allowing in Deputy Kessler Weaver's testimony regarding statements made to him by appellant. Those statements, quoted supra, indicate appellant made a confessory statement which was a spontaneous exclamation, prior to being taken into custody. *Page 82 
Such statement was without doubt, freely volunteered and was admissible without laying a formal predicate. Laffitte v.State, Ala.Cr.App., 370 So.2d 1108, cert. denied, Ala.,370 So.2d 1111 (1979).
Further evidence was introduced of statements made to Deputy Kessler, and later to Investigator Slayton, after appellant was taken into custody. Both Deputy Kessler and Investigator Slayton testified as to the voluntariness of such statements. Appellant made no request for a hearing to be held outside of the jury's presence. Additionally, appellant did not raise timely objection to the introduction of the particular statements, and allowed the evidence to come in in toto before raising his objection. Finally, appellant elicited the same testimony from the State's witnesses during his cross-examination of Deputy Weaver and Investigator Slayton.
As the court has previously stated, "On the question of the voluntariness of a confession, the burden is not on the trial court to withdraw the jury ex mero motu, hear evidence on the question of the voluntariness of a confession outside the jury's presence, and expressly rule." Carroll v. State, Ala.Cr.App., 370 So.2d 749, 757, cert. denied, Ala.,370 So.2d 761 (1979). The trial court, here, in monitoring the proceedings during the trial, was able to determine the voluntariness of these statements without a formal hearing. Further, the accused failed to interpose timely objections to the statements, and allowed the entire statement to come in, in both instances, before raising his objection. Considering these facts along with appellant's own questions on cross-examination eliciting the same testimony, we find no reversible error.Carroll, supra.
We have carefully examined the record of this trial and find no error therein. The judgment of the trial court is therefore affirmed.
AFFIRMED.
All the Judges concur.